**In the Matter of the WELFARE OF J.J.B., a minor child.**

**Nos. C8–84–1647, C4–84–2178.**

Supreme Court of Minnesota.

July 11, 1986.

---

Michael Q. Lynch, Kandiyohi Co. Atty., Willmar, for Kandiyohi County.

Rolf Sletlen, Willmar, for Child.

Thomas Johnson, Willmar, for Mother.

Carol Leopold, Willmar, guardian ad litem.

COYNE, Justice.

On August 9, 1984, the Family Division of the Kandiyohi County Court terminated the parental rights of L.B., the natural

mother of J.J.B., a minor child. Based on its determination that the child's mother had never been given either a copy of a written case plan or a verbal explanation of its contents, the court of appeals reversed. On February 14, 1986 this court, 381 N.W.2d 442, ordered reversal of the decision of the court of appeals and reinstatement of the county court's order. Our order provided that this opinion would follow.

J.J.B. was born in January of 1979. On three occasions during the first 11 months of her life J.J.B. was placed in foster homes, twice by voluntary placement because of L.B.'s epilepsy or blackouts. On November 26, 1979, on petition of the Kandiyohi County Family Services Department, J.J.B. was adjudicated a "dependent child" under Minn.Stat. § 260.015, subd. 6(d) (1978): a child "[w]ho is without proper parental care because of the emotional, mental, or physical disability, or state of immaturity of his parent, guardian, or other custodian." Pursuant to Minn.Stat. § 260.191, subd. 1 (1978), custody of J.J.B. was transferred to the county.

In the next two years the family services department formulated two separate plans to reunite mother and child. Neither was successfully completed, and in January of 1982, upon the county's petition, the county court terminated L.B.'s parental rights. On appeal, a three judge district court panel reversed on the ground that the county had not proved any of the statutory grounds for termination of parental rights. Custody, however, was continued in the county.

On October 29, 1982, the county court approved a third plan. This plan continued custody in Kandiyohi County Family Services until January 30, 1983, subject to conditions in which are set out detailed provisions relating to visitation; weekly counseling sessions; cooperation with the assigned social worker; the recommendations of psychiatric evaluators; the development and exercise of proper parenting skills, including proper discipline, which will meet the child's basic needs for food, clothing, and shelter and will permit her to develop the skills appropriate to her age; and development of the ability to handle stressful situations. The plan provided for increased visitation as its conditions were satisfied in an attempt to gradually reinforce the developing parent-child relationship. The order directed the county to file a status report on or before January 20, 1983, "[i]t being understood that during this period the Kandiyohi County Family Services will attempt to reunite the child in the child's home."

On February 17, 1983, the county again filed a petition for termination of L.B.'s parental rights, alleging failure of the third plan and citing the basis for termination set out at Minn.Stat. § 260.221(b)(5)(1982):

The juvenile court may, upon petition, terminate all rights of a parent to a child in the following cases:

*       *       *       *       *       *

(b) If it finds that one or more of the following conditions exist:

*       *       *       *       *       *

(5) That following upon a determination of neglect or dependency, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination.

Following continuances and the withdrawal of counsel and substitution of new counsel for L.B., hearings on the petition were held in April and May of 1984.

A psychologist, Dr. Paul Borreson, who had observed mother and child together during four visits between October of 1983 and March of 1984, testified that these visits were hyperactive and hectic, almost frantic in nature, as L.B. tried to distract and please J.J.B. with non-stop activity. He stated that J.J.B. avoided physical contact with L.B. and that J.J.B. was becoming more vocal about her dislike of L.B. It was Dr. Borreson's opinion that L.B. was not teachable with respect to complex parenting skills and that she could not overcome her liabilities—i.e., her psychiatric disorder, borderline mental retardation, poor behavioral managerial skills, and her

lack of understanding of a child's ages and stages. Dr. Borreson saw little hope for the success of any reunification plan. He believed that termination of parental rights was in the best interest of the child and that there was no viable alternative.

Dr. John Bonde, chief of psychiatry at Brainerd State Hospital and L.B.'s treating psychiatrist during her six most recent hospitalizations, diagnosed L.B. as suffering from an organic personality syndrome, shown by her dramatic mood swings, impaired impulse control, and her suspicious, almost paranoid nature. He testified that the long-term prognosis was poor. Dr. Bonde considered L.B. suicidal; at least some of her 10 to 20 suicide attempts were serious. L.B. was hospitalized at Brainerd State Hospital six times between December of 1982 and January of 1984 because of suicide attempts or threats. Because of what he perceived as L.B.'s inability to deal with stressful situations, Dr. Bonde was of the opinion that a very structured non-stressful environment would be best for L.B. and that she had slim chance of living in society without supervision.

Another psychologist, Dr. John O'Regan, concurred with Dr. Bonde's diagnosis and prognosis. He regarded L.B.'s suicide attempts and threats as manipulative, and he testified that L.B.'s characterological disorder and intelligence level inhibit her ability to develop parenting skills.

There was evidence that county social workers had scheduled 35 home or office visits with L.B. between August of 1982 and December of 1983, that L.B. had cancelled five scheduled visits and that she had simply failed to appear on nine occasions. There was no evidence of appreciable progress, and social workers involved in attempting to implement the plan concluded reunification was an unattainable goal.

Dr. George Heikens, a psychologist, agreed that L.B. has an organic personality disorder and low borderline intelligence, but he considered L.B.'s conduct toward J.J.B., during the one hour visit that he had observed, loving and caring and not emotionally neglectful. He pointed out that most people of borderline intelligence are not unfit parents, and he expressed the view that, without some showing of physical or emotional neglect or abuse, an organic personality disorder did not afford sufficient basis for termination of parental rights. In his opinion L.B. could provide for her child's emotional needs and successfully parent her daughter. He regarded the fact that J.J.B. was in foster care as the primary cause of the problems with the relationship between L.B. and J.J.B., but his recommendation was that they be placed together in a foster home.

On August 9, 1984, the court issued an order terminating L.B.'s parental rights based on detailed findings of fact regarding the determination of dependency pursuant to Minn.Stat. § 260.015, subd. 6(d) and setting out the efforts made and the failure of those efforts to correct the conditions leading to that determination. In his accompanying memorandum, the trial judge declared that there was clear and convincing evidence that L.B. is and will continue to be unable to provide J.J.B. with the required physical and emotional care. Acknowledging that mental illness alone is not a sufficient ground for termination of parental rights, the trial judge pointed out that despite L.B.'s good intentions and the efforts made to reunite mother and child, L.B. was incapable of providing adequate care; and he found clear and convincing evidence that continuance of the parent-child relationship would be detrimental to J.J.B. The court of appeals reversed.

We granted the petition of the Kandiyohi County Family Services Department in order to reexamine the competing societal interests and the legal presumptions and protections attending the fundamental parent-child relationship. Family unit and a commitment to the nurturing of children are frequently cited as cornerstones of the American way of life. These values give rise to a presumption that a natural parent is a fit and suitable person to be entrusted with the care of his or her child and that it is ordinarily in the best interest of a child to be in the custody of his or her natural

parents. *In re Welfare of Clausen*, 289 N.W.2d 153, 156 (Minn.1980). Abuse and neglect, however, all too often compel courts to intervene in the parent-child relationship and decide where and in what circumstances children will live. Even in those cases in which intentional abuse or neglect has been demonstrated, courts proceed with great care and deliberation in the termination of parental rights. When, as in the present case, the child's dependency is the result of some disability which renders the parent unable, no matter how loving and no matter how willing and well intentioned, to provide proper parental care, courts are most reluctant to terminate permanently the parent/child relationship. The thrust of the statutory provisions for neglected or dependent children is the strengthening and preservation of the child's family ties wherever possible. Minn.Stat. § 260.011, subd. 2 (1984). The termination of parental rights is appropriate only if it reasonably appears that the condition of dependency or neglect will continue for a prolonged, indeterminate period. *In re Welfare of Barron*, 268 Minn. 48, 53, 127 N.W.2d 702, 706 (1964).

The circumstances of this case prompt us to observe that one of the major philosophical concepts of the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620–25, 627–28, 670–76 (1982), is that, if a child can be safely protected in his or her own home through the provision of services or other assistance to the child's family, that alternative is preferable to foster care placement.[1] The prevention of unnecessary foster care is consistent with the

right of family integrity, a reciprocal right of parents and children.

The preference for maintaining a child in his or her own home has been expressed in the stated purpose of the Minnesota Juvenile Court Act since its enactment in 1959:

> Subd. 2. The purpose of the laws relating to juvenile courts is to secure for each minor under the jurisdiction of the court the care and guidance, preferably in his own home, as will serve the spiritual, emotional, mental, and physical welfare of the minor and the best interests of the state; to preserve and strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when his welfare or safety and protection of the public cannot be adequately safeguarded without removal; and, when the minor is removed from his own family, to secure for him custody, care and discipline as nearly as possible equivalent to that which should have been given by his parents. The laws relating to juvenile courts shall be liberally construed to carry out these purposes.

Minn.Stat. § 260.011, subd. 2 (1960).[2]

The act establishes dispositional alternatives for maintaining a child alleged or adjudicated dependent or neglected in his own home or elsewhere. Moreover, it authorizes the trial court to continue the case for a limited period during which the child may be placed under the protective supervision of the county welfare board or child placing agency in his own home under conditions prescribed by the court and de-

---

**1.** The preference for preventing removal of a child from his or her own home is reflected in Minnesota's recently enacted Permanency Planning Grants to Counties Act, Minn.Stat. §§ 256F.01–.07 (Supp.1985). Grants distributed under the act are to be used for placement prevention and family reunification services, including preplacement review of each request for substitute care placement, family-based services (intensive family-centered services to families primarily in their own home and for a limited time), 24–hour emergency caretaker and homemaker services, day care, crisis counseling, individual and family counseling, and procedures and arrangements for access to available emergency financial assistance. 42 U.S.C.

§ 672(a)(1) (1982) provides that federal funding for placement of individual children in foster care will be conditioned on a judicial determination in each case that the state has made reasonable efforts to prevent placement or reunify the family.

**2.** In 1980 Minn.Stat. § 260.011, subd. 2 was amended to expressly refer to children alleged or adjudicated neglected or dependent and to state separately the purpose with respect to children alleged or adjudicated to be delinquent. Act of April 15, 1980, ch. 580, § 3, 1980 Minn. Laws 966.

signed to correct the neglect or dependency. The order must contain findings of fact to support the disposition and address the following:

(a) Why the best interests of the child are served by the disposition ordered; and

(b) What alternative dispositions were considered by the court and why such dispositions were not appropriate.

Minn.Stat. § 260.191, subd. 1a (1984).

This "best interests of the child" standard, viewed by the legislature as critical to the trial court's placement disposition, has only recently emerged as a compelling factor in parental rights termination proceedings. In *In re Petition of Linehan*, 280 N.W.2d 29 (Minn.1979), this court rejected the use of that standard. However, after significant statutory amendments in 1978, it became clear that the legislature intended to balance the interests of both parent and child in determinations to continue or terminate the relationship. *In re Welfare of HGB*, 306 N.W.2d 821, 826–27 (Minn.1981); *see also In re Welfare of PJK and JLK*, 369 N.W.2d 286 (Minn.1985) (termination of parental rights under Minn. Stat. § 260.221(b)(7); *In re Welfare of K.T.*, 327 N.W.2d 13 (Minn.1982) (voluntary termination of parental rights).

At the same time, the doctrine has long been recognized as the common thread in cases determining, in various other contexts, the circumstances in which children are required to live. *See, e.g., Pikula v. Pikula*, 374 N.W.2d 705 (Minn.1985) (marital dissolution custody determinations); *Grein v. Grein*, 364 N.W.2d 383 (Minn. 1985) (modification of child custody award); *Rutten v. Rutten*, 347 N.W.2d 47 (Minn. 1984) (visitation rights); *Auge v. Auge*, 334 N.W.2d 393 (Minn.1983) (custodial parent removing child from state); *State ex rel. Kremin v. Graham*, 318 N.W.2d 853 (Minn.1982) (authority to require paternity blood testing); *In re Application of Sax-ton*, 309 N.W.2d 298 (Minn.1981) (petition for change of surname); *see also* Minn. Stat. § 259.28 (1984) (adoption); Minn.Stat. § 260.191, subd. 1a (1984) (disposition of children abused, neglected, dependent or neglected and in foster care); Minn.Stat. § 518.17, subd. 1(c), (d), (e), (f) (1984) (marital dissolution custody).

We see no basis for distinguishing among the various child placement procedures, whether temporary or permanent, and adopt the best interest of the child standard as a paramount consideration in termination of parental rights proceedings. We have previously observed the importance of emotional and psychological stability to a child's sense of security, happiness and adaptation, as well as the degree of unanimity among child psychologists regarding the fundamental significance of permanency to a child's development. *Pikula*, 374 N.W.2d at 711; *see* J. Goldstein, A. Freud & A. Solnit, *Before the Best Interests of the Child* 31–35 (1979).

The trauma initially attendant upon the separation of the child from his family is sometimes followed by the physical and emotional harms associated with prolonged out-of-home care. Foster care, originally intended as a system of temporary care for children who would ultimately return to their natural families, has, in many instances, become a system of long-term care characterized by considerable instability for the children.[3] Children in foster care for long periods are from time to time placed in different homes and with different caretakers; statistically, they rarely return to their familial homes.[4] Accordingly, long-term placement is often inconsistent with the public policy embodied in Minn. Stat. § 256F.01 (Supp.1985), the right of all children to live in families that offer a safe, permanent relationship with nurturing parents or caretakers and have the opportunity to establish lifetime relationships.

---

3. English, *The Foster Care System and the Role of Legal Services*, 14 Clearinghouse Rev. 1234, 1237 (1981).

4. Musewicz, *The Failure of Foster Care: Federal Statutory Reform and the Child's Right to Permanence*, 54 So.Cal.L.Rev. 633, 646 (1981).

■ We therefore conclude that where, as here, the record demonstrates a long-term placement characterized by a repeated failure of reasonable efforts to reunite the family, the trial court should appropriately determine what action most readily promotes the best interests of the child. While judicial caution in severing the family bonds is imperative, untoward delay of the demonstrated inevitable is intolerable.

L.B. suffered and still suffers from an organic personality disorder that causes her to experience wide mood swings and to lack insight into her problems. Her frequent suicide attempts or threats and numerous hospitalizations indicate her inability to cope with stressful situations. The evidence supports the conclusion that L.B. is incapable of providing adequate parental care for J.J.B. and that there is little chance for improvement. The result of state intervention, however, has been to cast J.J.B. adrift on a Sargasso Sea of foster care for all but a few months of her seven years. The trial court here properly found that the best interest of the child would be served by termination of L.B.'s parental rights so that J.J.B. could be placed for adoption and provided a permanent, stable home environment. There was also some testimony that ending the uncertainty of the situation, even if resolution meant the termination of parental rights, would be in L.B.'s best interest as well. While we do not question L.B.'s love and affection for J.J.B., in the conflict here presented between the interests of parent and child, parental rights must yield to the best interest of the child.

Despite the pronouncement of a general rule that the best interest of the child is of paramount importance in the disposition of petitions for termination of parental rights, we deem it necessary to examine each of the specific issues raised by this appeal.

■ The court of appeals reversed the termination order on the grounds that L.B. had received neither a copy of the plan for reunification nor an explanation of its contents and that there were no compelling circumstances which would justify termination of parental rights without the presentation of a reunification plan. Although we agree that there is no evidence of abandonment or of the kind of abuse or other conditions that would justify terminating L.B.'s parental rights without the presentation of a written case plan, the record does not support the conclusion that L.B. was not given a copy of the written plan and was not informed of its contents. L.B. testified that she did receive a copy of the plan but that she subsequently gave her copy to the Stearns County social worker to whom the case was assigned. The social worker who had prepared the plan testified that she had not read the reunification plan to L.B. word for word, but that she had discussed with L.B. the necessity for compliance with specific points of the plan. She remembered, however, as did the judge, that at the hearing on October 29, 1982, the judge read each item in the plan to L.B. The record of that hearing confirms that the judge reviewed virtually the entire plan, carefully inquiring of L.B. regarding her understanding of each item and warning her that failure to abide by the plan would result in further court action. There was a written reunification plan, and this parent was told about the plan and what was expected of her and what conditions must be improved. That one social worker did not read the plan to the mother, word for word, is not a basis for reversal of the termination order.

■ L.B., however, attacks the termination order on three other grounds. First, she contends that the original determination that J.J.B. was a dependent child was incorrect and that, therefore, the determination of dependency is not a ground for termination of her parental rights pursuant to Minn.Stat. § 260.221(b)(5) (1984). She asserts that the dependency determination was based on untrue allegations that L.B. was psychotic and that she had placed the infant J.J.B. in a position of extreme danger. It is quite true that L.B.'s condition is correctly identified as an organic personality syndrome rather than a psychosis and

that it is conceded that there was no foundation for the allegation that L.B. had placed the infant in a place of great danger. The time for questioning the 1979 dependency determination has, however, long since expired. An appeal from an order adjudging a child to be dependent must be taken within 30 days of the filing of the order. Minn.Stat. § 260.291 (1984). More to the point, the argument does not address the propriety of the determination in November of 1979 that J.J.B. was a dependent child: a child "[w]ho is without proper parental care because of the emotional, mental, or physical disability, or state of immaturity of his parent, guardian, or other custodian." Minn.Stat. § 260.015, subd. 6(d) (1984). Nothing in the record before us suggests that the finding that J.J.B. was not receiving proper parental care was erroneous regardless of the precise character of the mother's mental or emotional disability.

 L.B. also complains that the termination of her parental rights is based on the finding that she suffers from an organic personality disorder, which is a form of mental illness, but that mental illness does not justify termination of parental rights. *See In re Welfare of Kidd*, 261 N.W.2d 833, 835 (Minn.1978). Although mental illness, in and of itself, is not a statutory ground for the termination of parental rights, the effect of mental illness on the parent's conduct may indeed meet the statutory criteria. *Id.* If mental illness or other mental or emotional disability precludes a parent from providing proper parental care and defeats all reasonable efforts to remedy the conditions which led to a determination that a child was a dependent child, the statutory requirement for termination has been met. Minn.Stat. § 260.221(b)(5) (1984). Here the county court concluded that there was clear and convincing evidence that because of her mental condition, for which she has been treated since 1966, the mother is unable to give proper physical and emotional care to her child, even though she dearly loves the child, and that the mother's condition is likely to continue for such a long time that

reunification is unlikely. *See In re Welfare of Clausen*, 289 N.W.2d 153, 155 (Minn.1980); *In re Welfare of Barron*, 268 Minn. 48, 53, 127 N.W.2d 702, 706 (1964). L.B.'s brief concedes the permanency of her condition.

 Finally, L.B. contends that the county has not made reasonable efforts to assist her in correcting the conditions which led to the determination of J.J.B.'s dependency. The county points out that Kandiyohi and Stearns Counties have attempted through the assistance of 21 different social and medical service agencies to help L.B. correct the conditions which led to the dependency determination. Although the quality of the assistance afforded a parent who is attempting to provide proper parental care is undoubtedly more critical than the mere quantity of service, a review of this record convinces us that, from the determination of dependency and transfer of custody in 1979 until visitation was finally discontinued by the November 8, 1984 order of the district court, the county did make a reasonable effort to reunite mother and daughter.

The decision of the court of appeals is reversed and the orders terminating parental rights and discontinuing visitation are affirmed.