In the Matter of the WELFARE OF A.H., J.H. and C.H., Children.

No. C1–86–1316.

Court of Appeals of Minnesota.

March 17, 1987.

James Terwedo, Scott County Atty., Miriam Jeanne Wolf, Asst. County Atty., Shakopee, for children.

Steve L. Bergeson, Jordan, for appellant mother.

Eugene C. Wann, New Prague, for respondent father.

Elizabeth B. McLaughlin, Shakopee, for Guardian ad litem and children.

Diane K. Johnson, Eagan, Guardian ad litem.

Considered and decided by POPOVICH, C.J., and SEDGWICK and CRIPPEN, JJ., with oral argument waived.

## OPINION

CRIPPEN, Judge.

A mother whose parental rights were terminated pursuant to three statutory grounds appeals from the judgment and order denying a new trial. We affirm.

## FACTS

R.W.H. and appellant C.A.H. were married in November 1977 and are the parents of three minor children: A.H., born December 31, 1977; J.H., born November 23, 1979; and C.H., born August 28, 1982. C.A.H., the children's mother, was their primary caretaker, with R.W.H. providing little or no parenting.

In 1980, C.A.H. began receiving psychiatric counseling for help with recurring episodes of believing someone was trying to break into her house in order to injure or kill her. These experiences were incapaci-

tating and prevented her from adequately caring for her children. C.A.H. has since been determined to have a paranoid schizophrenic disorder. She is treated with antidepressant and antipsychotic medications, but she often fails to consistently take her medication and continues to have psychotic episodes. She has occasionally been hospitalized during particularly severe crises.

Respondent Scott County began providing the family with a variety of social services soon after R.W.H. and C.A.H. married. This assistance intensified due to C.A.H.'s mental illness and included homemaker and social worker services, parenting skill instruction, day care for the children, public health nursing, financial assistance to repair the family's home and pay heating bills, transportation for C.A.H. to medical and counseling appointments, and enrollment of A.H. and J.H. in a Developmental Achievement Center (DAC).

From 1978 through September 1983, county workers documented numerous examples of parental inadequacies, including repeated failures to keep the house clean and to bathe, clothe, or feed the children. In addition, J.H. suffered several injuries while C.A.H. was at home with the children. In October 1982, J.H. wandered onto the highway in front of the family's house and was hit by a car, breaking her leg; in July 1983 she was seriously injured by a dog while playing outside; and in August 1983 J.H. fell out of a second floor window, came back inside, and lay down on the sofa without C.A.H. being aware that she had fallen. J.H. was hospitalized for head injuries following this last episode. R.W.H. never assumed any parental duties and would take the children to his parents' home when C.A.H. was hospitalized or otherwise incapacitated.

In September 1983, C.A.H. suffered a mental crisis, and she approached Scott County Human Services (SCHS) for help with the children. She and R.W.H. signed a voluntary placement agreement with the county and the children were placed in a foster home. Their foster mother, Sarah Mobley, described A.H. (then nearing age

6) and J.H. (nearing age 4) as small, pale, and thin, missing large chunks of hair, unable to wash their faces, brush their teeth, comb their hair, dress themselves, use eating utensils, drink from a cup, or go to the bathroom without help. Mobley and aides at the DAC described J.H. She showed no natural curiosity, avoided all eye contact, and spoke unintelligibly. C.H. (age one) had only four teeth, could not chew or eat solid food, did not communicate with either sounds or eye contact, and did not know how to sit up, crawl, or pick things up. Evaluations performed by psychologist Dr. Susan DeVries in January 1984 confirmed that all three of the children were severely developmentally delayed.

Initially, R.W.H. and C.A.H. visited the children on a fairly regular basis, usually twice a week. However, SCHS terminated visitation in January 1984 because of its negative effect on the children. Mobley stated that A.H. and J.H. hid their shoes and coats when they were to go meet their parents, that J.H. sometimes returned from visits in almost a catatonic state, and that C.H. returned without clean diapers. When visits took place at the foster home, Mobley observed that neither parent exerted any control over the children and that R.W.H. did not participate unless the children approached him. A.H. and J.H. cried, ran uncontrolled around the house, or hid in the bathroom during the visits. C.H. did not appear to recognize or respond to his parents in any way, and they also paid little attention to him, to the point of ignoring him as he was choking on a piece of cellophane paper during one visit.

In January 1984, respondent county petitioned to terminate the parental rights of R.W.H. and C.A.H. Psychologist Dr. Lowell Campbell evaluated the parents in April 1984 and concluded that "it is highly unlikely that significant positive and permanent changes in the psychological and parental functioning of [R.W.H. and C.A.H.] will occur regardless of the interventions which are taken." Throughout 1984, county social workers continued reg-

ular counseling and parental skills training sessions with C.A.H., but reported no progress.

Campbell re-evaluated R.W.H. and C.A.H. in April 1985. He reported that since his April 1984 contact with C.A.H. he had been called upon to help her four times, twice in February 1985. He stated that on these occasions C.A.H. was "clearly out of touch with reality and required rather extensive phone consultation during the early morning hours to calm her down."

Campbell concluded from his April 1985 evaluation that R.W.H. and C.A.H. "appeared essentially unchanged from my 1984 evaluation," and that they "continue to show little, if any, insight into their own psychological functioning, roles and responsibilities as parents." The "consultation did not provide me with any new hope that they are in a better position to parent their children at this point in time than they were one year ago." He recommended "that all three children will be best served by placement outside of the parental home and that termination of parental rights is a necessity in this case."

In May 1985, Dr. DeVries re-evaluated the children and reported satisfactory progress, although they still exhibited developmental delay. DeVries also evaluated R.W.H. and C.A.H. and recommended a trial series of supervised visits with the children. However, DeVries concluded the children should continue to stay in foster care because R.W.H. and C.A.H. had not shown an ability to meet the "special educational needs [of A.H. and J.H.], which include a high need for environmental stimulation to maintain their cognitive growth," or to provide the necessary "model of healthy social and emotional behavior" for all three children.

In July 1985, by stipulation of the parties and parental admissions of neglect of the children, the county agreed to amend its 1984 petition to a neglect petition, subject to review after five months. The parties further stipulated to a transfer of legal custody of the children to SCHS. In addition, the parents agreed to comply with the following conditions: (1) participation in the county's Family Reunification Program, (2) involvement in the children's schooling by attending all meetings and following all suggestions, (3) regular meetings with county social workers; (4) involvement of the children in individual therapy as determined by SCHS; and (5) visitation with the children as determined and structured by the Family Reunification Program staff. C.A.H. further agreed to take her prescribed medication and participate in individual therapy. R.W.H. further agreed to find employment.

At the conclusion of the review period in December 1985, the county renewed its termination of parental rights petition, based on the Family Reunification staff report that R.W.H. and C.A.H. failed to meet the goals of the rehabilitative plan, the children continued to be harmed by the visitations, and reunification of the family was not possible. The trial court considered the petition in March 1986 and heard testimony from (1) the parents, (2) psychiatrists, psychologists, and other health care professionals who have either treated or evaluated C.A.H. or the children, (3) four teachers who have worked with A.H. and J.H. in the areas of learning disabilities, speech and language, and other special needs, (4) the children's foster mother, (5) county social workers, child protection workers, DAC workers, and home health workers who have provided the family with assistance since 1977, and (6) the Family Reunification Program employee assigned to the case pursuant to the July 1985 stipulation.

In June 1986, the trial court issued findings and ordered the termination of the parental rights of R.W.H. and C.A.H. The court referred to three statutory grounds as grounds for its determination.[1] The

---

1. Minn.Stat. § 260.221(b) (1984) provides in part that a court may terminate all rights of a parent to a child if it finds that one or more of the following conditions exist:

(2) That the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship,

court denied the parents' motions for amended findings or a new trial. C.A.H. appeals, challenging the sufficiency of the evidence and claiming the trial court erred as a matter of law in failing to dismiss respondent's petition for noncompliance with the parties' stipulation.

## ISSUE

Is the trial court's termination of C.A. H.'s parental rights supported by clear and convincing evidence?

## ANALYSIS

■ A natural parent is presumed to be "a fit and suitable person to be entrusted with the care of his or her child [such that] it is ordinarily in the best interest of a child to be in the custody of his or her natural parents." *In re Welfare of J.J.B.*, 390 N.W.2d 274, 277–78 (Minn.1986). *See In re Welfare of Clausen*, 289 N.W.2d 153, 156 (Minn.1980). In termination of parental rights cases, this preference for the preservation of the family shapes the law on trial court standards, petitioner's burden of proof, and the scope of appellate review.

The cause for a trial court's termination of parental rights must be "grave and weighty." *In re Welfare of H.G.B.*, 306 N.W.2d 821, 825 (Minn.1981) (citation omitted). The trial court may find that "one or more" conditions under the statute support the termination. Minn.Stat. § 260.221(b) (1986). *See In re Welfare of R.M.M.*, 316 N.W.2d 538, 541 (Minn.1982).

■ Minnesota has also "adopt[ed] the best interest of the child standard as a paramount consideration in termination of parental rights proceedings." *J.J.B.*, 390 N.W.2d at 279. In expressly adopting this standard, the supreme court stated:

> including but not limited to providing the child with necessary food, clothing, shelter, education, and other care and control necessary for the child's physical, mental or emotional health and development, if the parent is physically and financially able; or
> \* \* \* \* \* \*

We therefore conclude that where \* \* \* the record demonstrates a long-term placement characterized by a repeated failure of reasonable efforts to reunite the family, the trial court should appropriately determine what action most readily promotes the best interests of the child. While judicial caution in severing the family bonds is imperative, untoward delay of the demonstrated inevitable is intolerable.

*Id.* at 280. A court evaluating a child's best interest must consider the interest (1) of the child to be in the custody of his or her natural parents, which is normally the child's predominant interest, and (2) must take account of the parents' interest in preserving their relationship with the child, but (3) must also consider circumstances that promote other of the child's interests. *See id.* at 277, 279.

In addition, the Minnesota Supreme Court has construed the statute to require "that the evidence relating to termination must address conditions that exist at the time of the hearing," and "that it must appear that the present conditions of neglect will continue for a prolonged, indeterminate period." *In re Welfare of Chosa*, 290 N.W.2d 766, 769 (Minn.1980).

■ The petitioner has the burden of proving a statutory ground by clear and convincing evidence. *In re Welfare of Rosenbloom*, 266 N.W.2d 888, 889–90 (Minn. 1978). The trial court's determination must be supported by "clear and specific findings which conform to the statutory requirements." *R.M.M.*, 316 N.W.2d at 540–41. Specifically, subsection (2) requires findings on substantial, continuous, or repeated neglect of parental duties; subsection (5) requires findings demonstrating that reasonable efforts have failed to correct conditions leading to an earlier deter-

> (5) That following upon a determination of neglect or dependency, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination; or
> \* \* \* \* \* \*
> (7) That the child is neglected and in foster care.

mination of neglect; and subsection (7) requires findings showing that the child is neglected and in foster care. *See* Minn. Stat. § 260.221(b)(2), (5) and (7).[2]

The supreme court has adopted "very stringent standards" in reviewing terminations of parental rights. *Chosa,* 290 N.W.2d at 769. While "some deference" is given to the trial court's findings, the appellate courts " 'exercise great caution in termination proceedings,' " and "will closely inquire into the sufficiency of the evidence to determine whether the evidence is clear and convincing." *Clausen,* 289 N.W.2d at 156 (quoting *In re Welfare of Kidd,* 261 N.W.2d 833, 835 (Minn.1978)).

### 1. Neglect of duties

The trial court found substantial and continuous neglect by C.A.H., the ground for termination set forth in subsection (2) of the statute. The court supported this finding with references to evidence in the record of the devastating effect of C.A.H.'s mental illness on her parental conduct. "Although mental illness, in and of itself, is not a statutory ground for the termination of parental rights, the effect of mental illness on the parent's conduct may indeed meet the statutory criteria." *J.J.B.,* 390 N.W.2d at 281 (citing *Kidd,* 261 N.W.2d at 835).

The trial court further found "no appreciable hope for improvement" in C.A.H.'s situation, reflecting the undisputed expert medical testimony that appellant continues "manifesting symptoms" of paranoid schizophrenia and that her mental instability will continue for a prolonged, indeterminate period.

Finally, the trial court found the children have special needs, a factor often considered when terminating parental rights. *See, e.g., In re Welfare of D.D.K.,* 376 N.W.2d 717, 721 (Minn.Ct.App.1985); *In re Welfare of T.M.D.,* 374 N.W.2d 206, 211 (Minn.Ct.App.1985), *pet. for rev. denied,* (Minn. Nov. 25, 1985); *In re Welfare of Udstuen,* 349 N.W.2d 300, 303–04 (Minn.Ct. App.1984). This finding is supported by

testimony of the children's foster mother, teachers, and evaluative psychologists, who agreed that the developmental growth achieved by the children since they were placed in foster care would be critically threatened by a return to their parents.

Appellant's long history of debilitating mental illness, her poor prognosis, and the children's special needs constitute clear and convincing evidence of cause under subsection (2) for termination of C.A.H.'s parental rights.

### 2. Failure to correct conditions

The trial court also found the children had previously been determined to be neglected and that reasonable efforts failed to correct the conditions leading to that determination. *See* Minn.Stat. § 260.-221(b)(5) (1984). The cornerstone of this finding was the evident ineffectiveness of the stipulated reunification plan.

Appellant raises three challenges to the court's finding under this subdivision. First, she claims respondent's efforts to reunite the family were not "reasonable" as required by the statute. She argues the county involved itself only to assess the family's status, and not to make a genuine effort to reunite them. Appellant raised this issue to the trial court in her motion for amended findings or a new trial. On appeal, she alleges the trial court erred as a matter of law in failing to dismiss the petition because of respondent's non-compliance with the stipulation.

In the circumstances here, we discern no material distinction between efforts to correct conditions and efforts to reunite a family. In *J.J.B.,* similarly, the family services department formulated three successive plans to "reunite mother and child," none of which involved transfer of even temporary custody to the mother and the last of which was nearly identical to the plan implemented here by the county and C.A.H. *See J.J.B.,* 390 N.W.2d at 276 (plan included supervised visitation, weekly counseling sessions, cooperation with social

**2.** The statutory provisions are quoted in foot-    note 1.

workers, psychiatric evaluations, and development of proper parenting skills). *See also In re Welfare of L.M.M.*, 372 N.W.2d 431, 432 (Minn.Ct.App.1985), *pet. for rev. denied,* (Minn. Oct. 18, 1985) ("plan for reuniting the family" involved supervised visitation, with assessment of the impact of visitation).

■ Furthermore, the reasonableness of the county's efforts is evidenced by the quantity and quality of assistance provided C.A.H., beginning as early as 1977 and intensified after adoption of the formal reunification plan. The range of efforts included homemaker visits, parenting skill instruction, daycare for the children to provide C.A.H. with a respite, special attention given by the DAC to the children's developmental needs, and transportation to therapy sessions.

Appellant next challenges that the reunification plan failed to clearly delineate what was needed to correct the conditions leading to the determination of neglect. She cites *In re Welfare of Copus*, 356 N.W.2d 363, 367 (Minn.Ct.App.1984), which reversed a termination of parental rights because the county failed to provide the parent with a written case plan. Here, however, C.A.H. stipulated to a specific written plan that was ratified by her attorney. Indeed, appellant admits her failure to meet one specific and critical goal, that of consistently taking her medication.

■ Moreover, the reunification plan met the minimum statutory requirements. *See* Minn.Stat. § 257.071, subd. 1 (1986). In particular, case plans must explain the "nature of the effort to be made by the social service agency * * * to reunite the family." *Id.*, subd. 1(7). The plan developed for R.W.H. and C.A.H. provided that part of the agency's effort would be to "report to all parties regarding the status of [R.W.H. and C.A.H.] in their program, including [their] ability to parent their children." C.A.H.'s individualized treatment plan further states that "the current plan" is to work on her parenting skills, and that a determination would later be made "on

whether to pursue a termination petition or continue the Family Reunification process."

■ Appellant's third challenge to the subsection (5) finding is that she should have been given more time to correct the conditions that led to the determination of neglect. We disagree. Although the formal reunification plan lasted only five months, C.A.H. had already been receiving help from a variety of county agencies for several years. A pattern of assistance in lieu of termination had been first identified early in 1984. These efforts were stymied by appellant's mental instability, the primary obstacle to her parenting ability. Her doctors give little hope that her condition will improve. Under these circumstances, the time provided was sufficient.

Because there is clear and convincing evidence that the county's reasonable efforts failed to correct the conditions leading to the determination of neglect, that the detail of the reunification plan was adequate, and that appellant's parenting is likely to be permanently impaired by her mental illness, the trial court properly terminated C.A.H.'s parental rights under subsection (5).

### 3. Neglected and in foster care

Finally, appellant challenges the court's subsection (7) finding that the children are "neglected and in foster care." She contends the court failed to make specific findings required to support termination under this subdivision. Subsection (7) incorporates the provisions of Minn.Stat. § 260.155 (1984) into a proceeding for the termination of parental rights. Section 260.155 lists factors to be considered when determining whether a child is "neglected and in foster care," a term defined in Minn.Stat. § 260.015, subd. 18 (1986).

■ We acknowledge the trial court did not make findings pursuant to the statutory definitions, nor did it make a specific determination on the children's best interests, declared to be an overriding consideration in termination cases. *See J.J.B.*, 390 N.W.2d at 279. Nevertheless, the trial court's findings reveal consideration of all

the relevant factors under subsection (7), and the findings deal with primary best interest factors. Finally, the trial court made sufficiently specific findings on two other statutory grounds. Under these circumstances, we will not remand for additional findings on the third basis for termination.

## DECISION

Sufficient evidence in the record supports the trial court's findings and order terminating appellant's parental rights.

Affirmed.