**In the Matter of the WELFARE OF N.C.K. and N.J.K.**

**No. C6–87–334.**

Court of Appeals of Minnesota.

Sept. 8, 1987.

John A. Edman, Edman & Edman, Fairmont, for appellant.

Terry W. Viesselman, Martin Co. Atty., Fairmont, for respondent.

Considered and decided by FOLEY, P.J., and PARKER and SEDGWICK, JJ., with oral argument waived.

## OPINION

PARKER, Judge.

K.K. is currently a patient at the State Security Hospital in St. Peter, Minnesota, for treatment of a mental illness and mental retardation. Pursuant to a dependency and neglect petition and following a proper hearing, the trial court found that grounds for termination of K.K.'s parental rights exist because her mental illness and mental retardation are detrimental to the physical and mental health of her two infant children. After finding that improvement in K.K.'s condition is not foreseeable, the trial court entered an order and judgment terminating her parental rights to her children, N.C.K. and N.J.K. K.K. appeals from the order which terminated her parental rights. We affirm.

## FACTS

N.C.K. and N.J.K. are identical twins born to K.K. on February 12, 1986. K.K., age 22, is currently residing at the State Security Hospital in St. Peter, Minnesota, after having been judicially committed by Martin County Court on the grounds of mental illness and mental retardation. The natural father of the minor children is D.M. The children were conceived while both K.K. and D.M. were patients at St. Peter. K.K. and D.M. are not now and never have been married to each other.

The day after the twins were born, a dependency and neglect petition was filed.

A detention hearing was subsequently held, at which time the court ordered that temporary legal custody of the children be placed with the Martin County Human Services Agency for placement in a foster home, where they remain at this time.

At a hearing on the dependency and neglect petition, K.K. admitted that the children were dependent because of her judicial commitment at the state hospital. The court then instructed County Human Services to conduct an evaluation of K.K.'s ability to parent her children.

A substitute-care placement plan required by Minnesota statutes was prepared by Martin County Human Services and forwarded to the county court. The major goal of the plan was to determine if it were possible for K.K. to successfully parent her children. Additional objectives of the plan were to provide visitation between the parents and the children during the time of foster care and to improve K.K.'s condition so that a less restrictive placement for her and the children could be found. These additional objectives were never accomplished.

K.K. was first committed to the St. Peter hospital between January and July 1979 and has been in residence there since April 30, 1985. She has had a long history of highly structured care since her judicial commitment for mental retardation and mental illness, with no significant change in her condition during the last eight years.

K.K.'s psychiatric diagnosis is that of mild mental retardation, with an IQ of 69, mixed personality disorder, with antisocial and borderline features, and an intermittent explosive disorder. Her mental retardation limits her ability to acquire, store and interpret new information. She has difficulty solving everyday problems and is unable to understand what is going on in a group setting. She is antisocial, showing a total disregard for social norms and the rights of other people. She has unpredictable mood swings, overreaction to ordinary events, and psychotic episodes, including hallucinations, paranoia and the hearing of voices.

She also has frequent outbursts of temper resulting in destructive behavior toward herself, others and property. She cut her own wrists in the presence of her younger siblings and has on a number of occasions assaulted others, including children, claiming that they irritated her. She has threatened to kill her sisters, her mother and a judge. She threatened to kill her unborn babies during a temper tantrum while in disciplinary confinement at St. Peter Hospital. She also has a history of setting fires.

Pursuant to the substitute-care plan and the instruction of the trial court, County Human Services contacted numerous mental health professionals for an evaluation of K.K.'s ability to successfully parent her children. K.K. was examined by Dr. Jonathan B. Jensen and Dr. Robert J. Rody, psychiatrists at the University of Minnesota. Dr. Jensen and Dr. Rody testified that her mental illness and mental retardation represented a danger to her children's physical safety as well as their emotional and social development. In their opinion, if the children were placed in their mother's care, they would be adversely affected, perhaps even killed. Their expert opinion led to a conclusion which recommended termination of her parental rights.

The children's medical needs are also complex and demanding, requiring skill and constant attention. Both children were born prematurely and have had multiple medical problems since birth. N.J.K. developed pyloric stenosis and a right inguinal hernia, requiring surgery shortly after birth. He was re-admitted to the University of Minnesota Hospital in early spring 1986 for persistent vomiting. He has since then had recurrent upper respiratory infections and at least two ear infections. His primary problem is developmental retardation in the category of cerebral palsy. Expert medical testimony indicates that he will continue to need special care in a high-stimulus environment with someone who is able to follow the instructions of a professional therapist.

N.C.K. has similar medical problems requiring constant and specialized care.

N.C.K. initially had a ventricular septal heart defect which was repaired surgically after birth. He has had episodes of hypoglycemia and further surgery for pyloric stenosis and repair of bilateral inguinal hernias. He has persistent problems with vomiting and gastroesophogeal reflux, which have resulted in significant feeding problems. He, too, has had upper respiratory and ear infections. He has failed to thrive and is developmentally delayed, requiring specialized feeding. Testimony from medical health care professionals indicates that the amount of stimulation and care received by both N.C.K. and N.J.K. during the next two years is critical to the results of their long-term development.

Following the recommendation of medical experts at the University of Minnesota and the failure of K.K. to improve her condition while at St. Peter Hospital, County Human Services filed a petition for termination of parental rights. At the hearing on the petition the trial court was advised that the children's father, D.M., would not appear and that he would permit the termination of his parental rights by default. The trial court appointed a guardian ad litem for the children as well as for K.K., both of whom made recommendations to the trial court that K.K.'s parental rights be terminated. A hearing was held resulting in the entry of an order and judgment terminating the parental rights of both D.M. and K.K. to their children, N.C.K. and J.J.K. K.K. appeals that judgment.

### ISSUE

Is the trial court's termination of parental rights of K.K. to N.C.K. and N.J.K. supported by clear and convincing evidence?

### DISCUSSION

■ Parental rights may not be terminated unless the party seeking termination presents clear and convincing evidence that a specific statutory ground for termination exists. *In the Matter of Welfare of Solomon,* 291 N.W.2d 364, 367 (Minn.1980); *In the Matter of Welfare of Rosenbloom,* 266

N.W.2d 888, 891 (Minn.1978). The court need find that only one of the statutory conditions exists in order to terminate parental rights. Minn.Stat. § 260.221(b) (1986); *In the Matter of the Welfare of R.M.M.,* 316 N.W.2d 538, 541 (Minn.1982).

In this case the court found two separate conditions under the following statutory sections to support termination of K.K.'s parental rights:

(4) That a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be permanently detrimental to the physical or mental health of the child; or

(5) That following upon a determination of neglect or dependency, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination * * *.

Minn.Stat. § 260.221(b)(4)–(5) (1986).

The trial court found that grounds for termination of K.K.'s parental rights exist because K.K. is unfit to be a party to the parent and child relationship due to mental illness and mental retardation, which directly relate to the parent and child relationship and which are permanently detrimental to the children's physical and mental health.

■ Although mental illness, in and of itself, is not a statutory ground for the termination of parental rights, the effect of mental illness on the parent's conduct may meet the statutory criteria. *In re Matter of the Welfare of J.J.B.,* 390 N.W.2d 274, 281 (Minn.1986). If the record shows that the parent is unable to care for his or her child because of an inability to recognize the infant's needs and limitations, or because of ineptness with regard to the mechanical functions of a parent, or because of bizarre and potentially dangerous conduct stemming from the condition of mental illness, the statutory requirement is satisfied. *See In re Welfare of Kidd,* 261 N.W.2d 833, 835–36 (Minn.1978). It must be shown, however, that the condition ex-

isting at the time of the hearing, in this case mental illness and mental retardation, will continue for a prolonged, indeterminate period of time. It must also be shown that all reasonable efforts to remedy the condition have been resisted, leading to a determination that the children are dependent. Minn.Stat. § 260.221(b)(5) (1986); *In re Matter of the Welfare of R.M.M.*, 316 N.W.2d at 541–42; *Matter of Welfare of Chosa*, 290 N.W.2d 766, 769 (Minn.1980); *In the Matter of Welfare of Udstuen*, 349 N.W.2d 300, 304 (Minn.Ct. App.1984).

■ K.K.'s mental illness has resulted in numerous instances of threats and explosive assaults on others which are well documented by her medical records. She has assaulted children, claiming they irritated her. She has threatened to kill her sisters, her mother, a judge and even her unborn babies.

K.K. argues that she should be given time to improve her condition following transfer to another treatment facility. However, there is no evidence in the record to support the conclusion that her condition will improve within the near future sufficiently enabling her to parent her children. Although medical testimony indicated that she may make some gains in regard to her mental retardation if placed in the proper environment, her mental illness may result in behavior that will be a danger to the children. Psychiatric testimony by experts at the University of Minnesota concluded that if the children were placed in the care of their mother, she would likely affect them adversely and may even kill them. They testified that it would be dangerous for her even to visit the children while in foster care.

K.K. also contends the county did not expend the reasonable efforts required by Minnesota statutes to remedy the conditions leading to the dependency determination. Minn.Stat. § 260.221(b)(5) (1986); *see also In the Matter of Welfare of E.L.H.*, 356 N.W.2d 795, 799 (Minn.Ct.App.1984) (Crippen, J., concurring specially). The county surveyed various facilities to see whether they could find a foster home that

would be able to care for both K.K. and the two children. However, St. Peter Hospital refused to consider discharge of K.K. to an outside placement if she were placed in the same facility as her children because of the state hospital's own liability. They would agree to a provisional discharge only if K.K. and her children were placed in separate facilities. Another condition of such a discharge was that K.K. maintain herself in an open ward at St. Peter Hospital for three months without being placed in restraints or being placed in a locked ward. K.K. was unable to fulfill this condition.

■ Although parents' rights to custody of their children should not be taken from them but for grave and weighty reasons, the law secures parents' right to custody only so long as they promptly recognize and discharge their corresponding obligations. *In the Matter of the Welfare of P.J.K. and J.L.K.*, 369 N.W.2d 286, 290 (Minn.1985); *In the Matter of Welfare of HGB*, 306 N.W.2d 821, 825 (Minn.1981). It was K.K.'s own behavior that caused the failure to remedy the conditions leading to her children's dependency. County Human Services' efforts were reasonable under the circumstances. Consequently, the requirements of Minnesota statutes are satisfied in this case.

■ K.K. also argues that there would be no harm in delaying termination of parental rights for a few months to allow her to transfer to a new facility that would permit the care for both her and her children. However, there is no evidence that allows the conclusion that a few months, or even a few years, will enable her to parent her children. Not only the interests of the parents, but also the best interests of the child, must be considered in determining whether to continue or to terminate the parental relationship. *In the Matter of J.J.B.*, 390 N.W.2d at 280; *In re Welfare of HGB*, 306 N.W.2d at 826–27; *see also In re Welfare of P.J.K. and J.L.K.*, 369 N.W.2d at 291–92. K.K.'s mental illness and mental retardation may make it impossible for her ever to be able to meet the special needs of her children. The children's foster mother noted that the children were

extremely demanding, requiring care not only from her but also from her entire family, and that she has been unable to find teenage babysitters capable of caring for them. The children's pediatrician testified that the quality of care received by the children during the next two years is critical to their later development. County Human Services, also noting that the early years of a child's development are critical, asserts that it is essential to the children's development that they have a permanent plan as soon as possible, especially since the children are presently adoptable.

In the context of the special needs of these children and because it is not foreseeable in the future that K.K. will be able to parent them, long-term foster care is not a reasonable alternative because it is contrary to their best interests and inconsistent with the public policy embodied in Minnesota statutes. While Minnesota statutes declare that it is the court's duty to ensure that all reasonable efforts are made to reunite a child with its family, Minn.Stat. § 260.012 (1986), when this is impossible the court should promptly and appropriately determine what action most readily promotes the best interests of the child. *See In re Matter of the Welfare of J.J.B.*, 390 N.W.2d at 280 (holding that the best interests of the child controls when long-term foster care is futile, noting that "[w]hile judicial caution in severing the family bonds is imperative, untoward delay of the demonstrated inevitable is intolerable.")

Because K.K.'s mental illness and mental retardation make her a present danger to her children, because this condition will not change in the foreseeable future, and because it is in the children's best interests that K.K.'s parental rights be terminated, we affirm the judgment of the trial court.

## DECISION

Affirmed.