In the Matter of the WELFARE OF
D.I. and D.I., Children.

No. C8–87–335.

Court of Appeals of Minnesota.

Oct. 13, 1987.

Paul C. Edman, Edman & Edman, Fairmont, for Father R.I.

Thomas Harder, Erickson, Zierke, Kuderer, Myster, Madsen & Wollschlager, Fairmont, for Mother P.I.

Terry W. Viesselman, Martin Co. Atty., Fairmont, for respondent Martin County Human Services.

R. William Barke, Krahmer Law Firm, Fairmont, for guardian ad litem.

Considered and decided by POPOVICH, C.J., and WOZNIAK, and NIERENGARTEN, JJ., with oral argument waived.

## OPINION

WOZNIAK, Judge.

The parents of two minor children question the sufficiency of evidence to support

the termination of their parental rights. We affirm.

## FACTS

Appellant P.I. and her husband, R.I., are the parents of two minor children: D.S.I., born December 23, 1974, and D.L.I., born October 1, 1975. The children currently reside in a foster home that has expressed a desire to adopt them.

Martin County Social Services first became involved with these children in August 1976. At that time, a dependency and neglect petition was filed in Martin County Court, alleging that the infant children were dependent and neglected because of their parents' emotional, physical, and mental disabilities. The petition specifically alleged that the children's mother, P.I., was mentally ill and chemically dependent, and therefore unable to care for her children, and that the father, R.I., was working 60 hours per week and refused to parent the children when he was at home.

The petition stated that, because of the problems the parents were having, the children's physical and mental health was suffering. Both children were severely anemic, and both had severe bladder or bowel control problems. Both children appeared to be withdrawn due to a lack of stimulation by their parents. D.L.I. had been hospitalized for malnutrition. D.S.I. behaved oddly.

An adjudicatory hearing was held on the petition in early September 1976. The court found the children to be dependent and neglected and without proper parental care. Both children were placed in the legal custody of Martin County Human Services Board for placement in a day-care center. Both parents were ordered to cooperate fully with Human Services to work on alleviating the conditions that led to the children's adjudication as dependent and neglected.

During the next three years, the county provided numerous services to the family in an effort to alleviate the conditions that had led to the dependency and neglect finding. Numerous social workers, a public health nurse, and a psychologist served as case managers for the file. Day care was provided for the children. The family received extensive services from a home health care worker, who assisted in teaching basic housekeeping skills.

The problems that were specifically addressed during this period were the general neglect of the children, the lack of supervision by the parents, the condition of the home, mother's mental health, and problems associated with R.I.'s not being home because of his long work hours. R.I.'s absence from the home during his 60–hour a week work schedule was a problem in that mother was consistently unable to provide for a safe environment for the children when he was absent.

In 1979 the court returned legal custody of the children to their parents, although the dependency and neglect petition was not dismissed and the children remained under continued protective supervision by the county.

From 1979 to 1984, the court reviewed the status of the case yearly and ordered continuing protective supervision of the children by the county.

In October 1984 the court again held a dispositional hearing in the dependency and neglect action, finding that P.I. had limited parenting abilities because of a combination of major problems. She suffered from schizophrenia and experienced gross psychotic episodes at frequent intervals. She was experiencing problems with her alcohol use, which were compounded by the fact that she needed to abstain from using alcohol both because of the dangers of alcohol's interaction with the psychotropic medications she needed to take and because of the tendency for her mental illness to be exacerbated by the use of any amount of alcohol. The court also noted that she had limited intellectual functioning.

R.I. was continuing to work two jobs, for 58 hours per week. This included extensive evening and weekend hours, times when the children were most likely to be home. He resisted efforts of the county to carry out programs designed to help the family achieve independence. He did not

recognize the limitations of his wife, and continued to provide her with alcohol although he had been told of the negative effects it had on his wife and that he should not provide her with alcohol any longer.

Both children were in poor physical and mental health. D.L.I. did not talk very much, was in frail health, was pale, cried often, vomited frequently, and had problems controlling both her bladder and bowels.

D.S.I. was experiencing similar emotional and physical trauma. His eyes did not align properly. Glasses had been prescribed to alleviate this condition, but he would break them to avoid having to wear them. He suffered from enuresis. He behaved oddly, such as rolling on the floor and making animal noises. He displayed inappropriate sexual behavior with other children in their neighborhood. He vomited often. His teeth were abscessed and painful from a lack of dental care.

The court also found both parents had either resisted or refused to participate in most of the programs offered by Human Services during the previous eight years to assist them in achieving family independence. P.I. was unable to provide the supervision and guidance required for her children, and her husband was unwilling to provide it.

The children were again placed in the county's legal custody, for purposes of placement in a foster home. The court directed the county to address the issue of what changes in R.I.'s employment situation would be needed in order to reunite the family.

The county then drafted a substitute care plan, the primary goals of which were to motivate the parents to correct the neglectful home environment, to teach R.I. the necessary skills to assume the role of primary parent, to correct the problem behavior of the children, and to reunite the family. The care plan outlined what programs were to be utilized in meeting those goals. Numerous services, activities, and individuals were involved in the specific implementation of the plan.

The county explored various possibilities with P.I. regarding cutting back his hours of work in order to allow him to be present to parent the children; this included offering him public assistance to replace income he would lose if he were to quit one of his jobs. R.I. refused to cut back his work hours.

The parents did not make significant progress on any of the goals during the next two years. Despite county teaching efforts, R.I. continued to be unwilling to parent his children. Overnight visitation, which was initially scheduled, was canceled after it was learned that R.I. was not always present during these visits. Even a three-hour a week visitation schedule had to be changed due to mother's inability to care for the children and father's inability to be present during those visits. The parents did continue to visit with the children. They never requested additional visitation.

In August 1986, the county case worker and supervisor conducted an administrative review of this case. They noted that, since the initial adjudication of dependency and neglect in 1976, over 20 direct line workers had provided services to this family and that the family had been offered 12 different programs to help them alleviate the problems that led to the children being declared dependent and neglected. The county determined that the children were unlikely to return home in the foreseeable future, and that it was in the best interests of the children to set up some type of a permanent home for them. It therefore petitioned for the termination of P.I. and R.I.'s parental rights.

In December 1986, a termination hearing was held. The trial court made extensive findings of fact. The court found that, since their placement in foster care two years prior to the hearing, both children's physical and emotional health had improved dramatically. The vomiting and bladder and bowel control problems had largely disappeared, although they would reappear at times when the children were to visit their parents. Both children's grades in school improved markedly, and both children had become involved in extracurric-

ular school activities. They were more talkative, social, and poised.

The children both testified in chambers at the trial. They indicated that, although they both loved their parents, they did not wish to return to live with them. They indicated that they were afraid of their mother's outbursts and that they did not want to be left alone with her.

Throughout the ten-year period from 1976 to the date of the hearing, mother had frequent difficulties in maintaining her mental health. She talked with imaginary people, screamed at her children, failed to recognize herself in the mirror, and hallucinated at irregular intervals. In addition to a recent six-month commitment for chemical dependency, she had been committed three times to the St. Peter State Hospital for treatment of mental illness. She also was treated in local hospitals for particular mental health crises on at least two other occasions. R.I. testified that P.I. continued to hallucinate at the time of the hearing.

A licensed consulting psychologist testified at the trial. He indicated that the combination of mental illness, chemical dependency, and low intellectual functioning created a great amount of havoc in P.I.'s life, and that the combination of the factors left her without the capacity to care for her two children. This assessment of P.I.'s inability to parent was concurred in by another psychologist, who also testified at trial.

Testimony of experts at trial also supports the trial court's finding that R.I. is unwilling to assume the role of primary parent, which is required of him by the inability of his wife to parent. His uninvolvement with the parenting of his children continued throughout his children's two-year placement in foster care. He acknowledges that his wife cannot parent the children, but hopes that they will still be able to return to her care at some unspecified time in the future.

He continues to refuse to cut back his work hours. He indicated that he must keep working because he has to keep moving due to an arthritic condition.

Neither he nor his wife want the children to have more visitation than they currently have.

## ISSUE

Did clear and convincing evidence support the trial court's findings that the necessary conditions existed for termination of appellants' parental rights pursuant to Minn.Stat. § 260.221(b), subd. (2), (4), (5) and (7)?

## ANALYSIS

A natural parent is presumed to be a fit and suitable person to be entrusted with the care of his or her child and it is ordinarily in the best interest of a child to remain in the natural parent's custody. *In re Welfare of A.H.*, 402 N.W.2d 598, 602 (Minn.Ct.App.1987). Trial courts should not permit termination of parental rights except for grave and weighty reasons, and must find that one or more conditions under the statute support termination. *In re Welfare of M.G.*, 407 N.W.2d 118, 120 (Minn.Ct.App.1987). In termination proceedings, the petitioner has the heavy burden of proving by clear and convincing evidence that statutory grounds for termination exist. *In re Welfare of Rosenbloom*, 266 N.W.2d 888, 889 (Minn.1978).

The Minnesota Supreme Court has construed the statute to require that the evidence relating to the termination must address conditions as they "exist at the time of the hearing," and it must appear that the conditions of neglect "will continue for a prolonged, indeterminate period." *In re Welfare of Chosa*, 290 N.W.2d 766, 769 (Minn.1980).

In this case, the trial court based its decision on four of the seven statutory factors:

(2) That the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, including but not limited to providing the child with necessary food, clothing, shelter, education, and other care and control necessary for the child's physical, mental or emotional

health and development, if the parent is physically and financially able; or

\* \* \* \* \* \*

(4) That a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be permanently detrimental to the physical or mental health of the child; or

(5) That following upon a determination of neglect or dependency, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination; or

\* \* \* \* \* \*

(7) That the child is neglected and in foster care.

Minn.Stat. § 260.221(b) (1986)

The trial court terminated P.I.'s rights under subd. (4), (5), and (7); it terminated the parental rights of R.I. pursuant to subd. (2), (5), and (7).

### I.

R.I. argues that this court should review the termination of his parental rights by determining whether he has "the present ability \* \* \* to develop a relationship beneficial to the child" and not whether it is in the child's best interest to terminate those rights. *In re Linehan*, 280 N.W.2d 29, 31 (Minn.1979); *In re Welfare of L.L.N.*, 372 N.W.2d 60, 63 (Minn.Ct.App.1985). We agree that we should closely examine the ability of R.I. to develop a relationship beneficial to his children, but do not agree that the two standards are mutually exclusive.

In cases involving long-term placement out of the home, we must conduct an inquiry into the best interests of the children. *In re Welfare of J.J.B.*, 390 N.W.2d 274, 280 (Minn.1986). The application of that standard involves an examination of the important right of the children and the parents to continue their relationship. *J.J.B.* at 277–78; *In re Welfare of N.C.K. and N.J.K.*, 411 N.W.2d 577, 581–82 (Minn. Ct.App.1987). The standard enunciated in

*Linehan* is merely an aspect of our inquiry into the best interests of the child. As in *Chosa*, we are concerned that the relationship between parent and child not be severed unless the conditions of neglect, including the ability of the parents to form positive relationships with their children, will continue for a prolonged and indeterminate period.

The record supports the termination of R.I.'s parental rights under the best interests of the child standard. The trial court made a specific finding that it was in the best interests of the children to terminate both parents' parental rights. The record of ten years of unsuccessful interventions into the dysfunctional aspects of this family clearly supports this conclusion. It is apparent that R.I. does not have the present ability or willingness to develop a relationship beneficial to his children; he is unwilling to change the behavior patterns that have contributed to their neglect.

### II.

Statutory grounds support the trial court's termination of both appellants' parental rights.

A. Neglect of duties, Minn.Stat. § 260.-221(b)(2).

The trial court found that R.I. had substantially, continuously and repeatedly refused and neglected to comply with the duties imposed on him by the parent-child relationship in that he had failed to provide the necessary supervision and parenting required by his children as a result of his wife's disabilities.

He argues that the demands made on him by the county to counterbalance the disabilities of his wife in order to enable him to keep his parental rights are unreasonable. He is, he argues, being asked to accomplish the superhuman, rather than just having to be a normally adequate parent.

The county, however, did not thrust the situation of dependency and neglect upon R.I. That was the result of the various factors interacting to produce an unstable, unhealthy, and insecure home environment

for the children. The county made numerous attempts, over the course of ten years, to assist all family members in overcoming the problems of the home. R.I. has chosen not to assume the role of ordinary parent, and testified that he will not do so in the foreseeable future. Coupled with his wife's inability to effectively parent, this supports the trial court's finding that R.I. has refused to comply with the duties imposed on him by the parent-child relationship.

While this court could affirm the trial court's termination of R.I.'s parental rights on the sufficiency of the evidence on the neglect factor alone, *see In re Welfare of R.M.M.,* 316 N.W.2d 538, 541 (Minn.1982), we will briefly address the other statutory grounds for termination of R.I.'s parental rights.

B. Palpably unfit, Minn.Stat. § 260.-221(b)(4).

█ The trial court found that grounds for termination of P.I.'s parental rights existed in that she was palpably unfit to be a party to the parent-child relationship due to the combination of disabilities that she had: mental illness, chemical dependency, and limited intellectual functioning. The court found that the problems arising from her disabilities were permanently detrimental to the physical and emotional health of the children.

We are acutely aware of the need to scrutinize the conclusion that these disabilities justify the termination of P.I.'s parental rights. As we have said:

A parent's rights cannot be terminated solely due to * * * mental retardation or illness. If, however, the mental illness or other mental or emotional disability precludes that parent from providing proper parental care and defeats all reasonable efforts to remedy the conditions which led to a determination of dependency and neglect, the statutory requirement for termination has been met.

(Citations omitted.) *In re Welfare of B.L.W.,* 395 N.W.2d 426, 430 (Minn.Ct.App. 1986).

In this case, expert testimony of two consulting psychologists indicated that P.I.'s combined disabilities precluded her being able to learn to parent. The experts concluded that the problems would not only continue, but are not expected to improve for an indefinite period of time.

The involvement, through ten years, of numerous social service personnel and the repeated hospitalizations support this result, along with the fact that the children, when living with their mother, become both physically and emotionally ill.

P.I.'s problems have been ongoing and continuous, with short periods of more appropriate behavior. She is still exhibiting signs of psychosis and shows limited understanding of her chemical dependency. Both experts testified that this conduct significantly interferes with the parent-child relationship and would continue to do so in the future. Clear and convincing evidence demonstrated that P.I. was palpably unfit to parent her children and will continue to be so in the future.

C. Failure to correct conditions, Minn. Stat. § 260.221(b)(5).

█ The trial court found that following the determination of dependency and neglect in 1976, reasonable efforts under the direction of the court have failed to correct the conditions leading to the dependency and neglect. The court cited this as an additional ground for terminating the rights of both parents.

Both parents argue that the county has not made reasonable efforts to correct the conditions leading to the determination of dependency and neglect.

The reasonableness of the efforts can be evidenced by the quantity and quality of assistance provided to the family. *A.H.,* 402 N.W.2d at 604. The record of numerous services provided to this family over a ten-year period provides clear and convincing evidence of the reasonable efforts of the county.

D. Neglected and in foster care, Minn. Stat. § 206.221(b)(7).

Finally, both parents challenge the trial court's finding that the children are neglected and in foster care. They note that the trial court neglected to make specific

findings required to support termination under this subdivision.

We acknowledge that the trial court did not specifically discuss these factors in making its decision. However, it is readily apparent that the trial court, in enumerating its findings on the other statutory factors, supported its decision on this ground.

## DECISION

Clear and convincing evidence in the record supports the trial court's termination of appellants' parental rights.

Affirmed.