**In the Matter of the WELFARE OF A.R.G.–B.**

**No. C5–95–2735.**

Court of Appeals of Minnesota.

July 9, 1996.

Brenda L. Theis, St. Cloud, for Appellants Parents.

Roger S. Van Heel, Stearns County Attorney, Theresa M. Kehe, Assistant County Attorney, St. Cloud, for Respondent Stearns County.

Charles M. Schiff, St. Cloud, for Respondents Foster Parents/Grandparents.

John D. Ellenbecker, St. Cloud, Guardian Ad Litem.

Considered and decided by TOUSSAINT, C.J., and HUSPENI and HOLTAN, JJ.

## OPINION

HARVEY A. HOLTAN, Judge.*

Appellants S.G. (mother) and A.B. (father) appeal the permanent placement order in a juvenile protection proceeding awarding legal and physical custody of appellants' daughter A.R.G.–B. to the mother's parents, V.G. and G.G. (maternal grandparents). The trial court found that considering A.R.G.–B.'s extreme need for consistent medical care, attentive parenting, and a healthy environment, A.R.G.–B.'s best interests require her permanent placement with the maternal grandparents pursuant to Minn.Stat. § 260.191, subd. 3b(a)(1) (1994). We affirm.

## FACTS

A.R.G.–B. and her male twin were born prematurely on April 5, 1994. Appellants have three other children, ages five, four, and two. The father is employed as a laborer, and the mother is not employed outside the home.

Because of their multiple health problems, both A.R.G.–B. and her male twin were released to appellants' care with an apnea monitor to alert appellants to slow or fast heart rates or decreased respiration. A.R.G.–B.'s male twin died on July 12, 1994, for unknown reasons. The children's apnea monitors had not been used for about 10 to 12 hours prior to the male twin's death. The children's doctor recommended that A.R.G.–B. be removed from appellants' home until the exact nature of her medical condition and the parental and environmental factors contributing to the male twin's death could be determined. Stearns County Social Services (the county) filed a child in need of protection or services petition on July 20, 1994. Pursuant to the trial court's order, A.R.G.–B. was placed in foster care on July 27, 1994.

On August 1, 1994, the trial court adjudicated A.R.G.–B. to be in need of protection or services on the basis of appellants' admission. The trial court issued an interim disposition order on August 18, 1994, directing appellants to immediately engage in budget planning with the county and providing that A.R.G.–B. would be placed with the maternal grandparents as soon as the maternal grandmother became a licensed foster care provider. A.R.G.–B. was placed with the maternal grandparents on September 19, 1994, and has remained there since that time.

The trial court's September 6, 1994, disposition order continued A.R.G.–B.'s temporary legal custody with the county and placement in foster care. The disposition plan included in the order contained the following elements: (1) that appellants work with a housekeeper provided by the county to maintain the housekeeping standard from week to week; (2) that appellants cooperate with an assessment and goals as determined by an

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn.Const. art. VI, § 10.

in-home skills counselor, to provide a safe, clean, and organized living environment for the family; (3) that prior to reunification, the home environment will have an adequate level of housekeeping, as determined by the social worker and public health nurse; (4) that appellants keep all scheduled appointments with service providers or cancel and reschedule appointments in a timely manner; (5) that appellants complete individual psychological and psychiatric evaluations and follow all recommendations; (6) that appellants attend individual therapy to determine and address issues of depression, grief, and loss, and other issues as may be recommended by the treating therapist; (7) that appellants cooperate and work with the assigned financial worker from the county and comply with the budget or recommendations of the financial worker; (8) that appellants follow all recommendations of A.R.G.–B.'s treating physicians and keep all appointments with the home health aide for the purpose of childcare, nutrition, and bathing; and (9) that appellants maintain a working telephone in the residence at all times. The order also allowed appellants liberal visitation with A.R.G.–B., except overnight visitation, which was to begin at the county's discretion. The county set a visitation schedule at the maternal grandparents' home for one hour, three times a week.

The first housekeeper placed by the county in October 1994 indicated she was not willing to return to appellants' home because the mother was not showing any effort to maintain the home, the home was filthy, and there was an unrelated male present in the home. The county placed a more experienced housekeeper in November 1994. Appellants and the second housekeeper agreed to terminate that housekeeper's services. The second housekeeper also indicated the mother had made no progress toward improving the cleanliness of the home. In December 1994, appellants requested that a third housekeeper not be placed in their home.

A county social worker conducted a diagnostic assessment of the mother on August 16, 1994. The assessment indicates that the mother's mood and affect appeared depressed but that her thought processes and content were appropriate. The mother met with the social worker for individual therapy on August 26, 1994. The mother failed to appear for the next three scheduled appointments, and the record does not show that further appointments were scheduled.

Appellants had no contact with their assigned worker from the county money-management program from October 1994, until April 1995, despite numerous letters from the worker requesting an appointment. Appellants obtained telephone service in their home in April 1995, but telephone service was discontinued by June 1995 because appellants had an unpaid phone bill of approximately $1,500 to $2,000. Appellants' cooperation with budget counseling was sporadic.

A county public health nurse provided nursing services to the family. In an April 1995 report, the nurse stated that appellants' housekeeping and follow-through on suggestions to improve safety in the home have been inconsistent. The nurse stated that while appellants have made improvements to the home, there continue to be overflowing trash cans in the home and trash in the yard. The nurse stated that she had observed only limited interaction between appellants and their three older children, and that the children appear dirty and unkempt. The nurse stated appellants have been offered enrollment in support groups and counseling to address their grief over the death of the male twin, but appellants have not engaged in counseling. In a September 1995 report, the nurse indicated that appellants' housekeeping remains inconsistent and that on some visits the children have appeared dirty.

The father completed a psychological evaluation in January 1995. The father described an extensive criminal history, including convictions for aiding and abetting an armed robbery, criminal sexual conduct, welfare fraud, driving while intoxicated, and misdemeanor theft. The father denied any mood or anxiety disorder and indicated he was not particularly depressed over the death of the male twin. The psychologist concluded that the father was not experiencing significant depression, anxiety, or feelings of grief or loss. The psychologist stated

the father has an antisocial personality disorder, which is not amenable to therapy.

The mother missed her initially-scheduled appointment for a psychological assessment in March 1995, but she was evaluated in May 1995 by both a psychiatrist and a psychologist. The psychiatric evaluation states the mother reported she was not significantly depressed by the death of the male twin at any time. The psychiatrist concluded that the mother was experiencing stress from the placement of A.R.G.–B. in foster care, but that there appeared to be no indication for psychiatric treatment. The psychological evaluation states the mother continues to have periodic bereavement reactions to the loss of the male twin, but that symptoms were not present to indicate clinically significant abnormalities.

The county terminated the services of appellants' in-home skills counselor in July 1995 to allow the mother to focus on an outpatient intensive parenting group. The in-home skills counselor's final report indicates that although some success has been achieved, cleanliness of the home remains a concern. The counselor stated appellants have slightly improved in their personal cleanliness and the cleanliness of the children, but that overall cleanliness of the family and home remains a struggle.

The mother actively participated in an intensive parenting group from July to September 1995. Both appellants also met with a counselor on two occasions in August 1995 to discuss parenting issues.

The reports of the professionals providing services to A.R.G.–B. all reflect the excellent quality of care provided by the maternal grandparents. The public health nurse stated that A.R.G.–B. is always clean and well-kept, that the maternal grandparents' home is child-proof and clean, and that A.R.G.–B. is growing and thriving in the maternal grandparents' home.

An early childhood special education home intervention teacher provides services to A.R.G.–B. at the maternal grandparents' home. The teacher's report reflects that A.R.G.–B. has made excellent progress, but continues to need intervention and close monitoring to ensure that progress continues. The teacher stated A.R.G.–B. must be in a safe, clean, well-supervised environment in which she can crawl, climb, run, and explore indoors and out, without risk of injury or exposure to unhealthy conditions. The teacher indicated A.R.G.–B. and the maternal grandparents are clearly attached to each other and stated she believes the maternal grandparents' faithful home follow-through has been critical to A.R.G.–B.'s progress.

The teacher also reported that until June 1995, she provided services to appellants' four-year-old daughter in appellants' home. The teacher stated she observed that the floors in appellants' home are dirty, sticky, and scattered with debris and that the children are dirty and unkempt. The teacher stated that all three children in appellants' home receive early childhood special education services and need special stimulation at home.

The children's doctor submitted a letter indicating he has been very impressed with the care provided to A.R.G.–B. by the maternal grandparents. The letter indicates that two of appellants' older children are behind on immunizations and that all three older children are lacking appropriate regular health maintenance examinations.

The county filed a petition for a permanent placement determination on July 20, 1995. At the September 27, 1995, permanent placement hearing, appellants waived their right to oral testimony, and the parties agreed that the court would base its decision on documents already filed, in addition to written reports from the service providers. The trial court's order permanently placing A.R.G.–B. with the maternal grandparents was filed November 28, 1995. This appeal followed.

## ISSUE

Does clear and convincing evidence support the trial court's order for the child's permanent placement with the maternal grandparents?

## ANALYSIS

Before 1993, a trial court could annually extend an out-of-home placement until the

child was "no longer a minor." Minn.Stat. § 260.191, subd. 2 (1992). In many instances, foster care became "a system of long-term care characterized by considerable instability for the children." *In re Welfare of J.J.B.*, 390 N.W.2d 274, 279 (Minn.1986). Long-term foster care placement is often inconsistent with

> the right of all children to live in families that offer a safe, permanent relationship with nurturing parents or caretakers and have the opportunity to establish lifetime relationships.

*Id.*

In 1993, the legislature amended the juvenile protection statute to require the court to order "permanent, legal and physical custody to a relative, adoption, or permanent foster care" placement within 12 months after the court places a child in a residential facility, with provisions for a six-month extension. 1993 Minn. Laws ch. 291, § 21; 1993 Minn. Laws 1st Spec. Sess. ch. 6, § 18. In 1994, the legislature amended the statute to limit the court's ability to order long-term foster care for children under age 12. 1994 Minn. Laws ch. 598, § 7. The apparent intent of the requirement for a hearing on the child's permanent status 12 months after the out-of-home placement is to reduce the physical and emotional harms caused by prolonged temporary care.

The current "permanent placement" provision of the statute provides that if the court places the child in a residential facility, as defined in section 257.071, subdivision 1, the court shall conduct a hearing to determine the permanent status of the child not later than 12 months after the child was placed out of the home of the parent. Minn.Stat. § 260.191, subd. 3b(a) (1994). The responsible social service agency shall file pleadings to establish the basis for the permanent placement determination. *Id.* If the child is not returned to the home, the available dispositions are: (1) permanent legal and physical custody to a relative; (2) termination of parental rights and adoption; and (3) long-term foster care under specified circumstances for a child who has reached age 12 or for the sibling of such a child. *Id.*

▮ Consistent with the level of proof generally required in child protection proceedings, the county must prove the allegations of the petition for permanent placement by clear and convincing evidence. *See* Minn. R.Juv.P. 59.05 (allegations of petition must be proved by clear and convincing evidence). As in termination of parental rights cases, the reviewing court determines on appeal whether the trial court's findings address the statutory criteria and are supported by "substantial evidence," or whether they are clearly erroneous. *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn.1990). In defining the standard of review in termination of parental rights cases, the supreme court has used the terms "substantial evidence" and "clear and convincing evidence" interchangeably. *See In re Welfare of S.Z.*, 547 N.W.2d 886 (Minn.1996).

▮ Appellant contends that because this matter was submitted to the trial court solely on documentary evidence, this court may disregard the trial court's findings and review the documentary evidence de novo. *See In re Trust Known as Great Northern Iron Ore Props.*, 308 Minn. 221, 225, 243 N.W.2d 302, 305 (1976) (where critical evidence is documentary, appellate court need not defer to trial court's assessment of that evidence), *cert. denied*, 429 U.S. 1001, 97 S.Ct. 530, 50 L.Ed.2d 612 (1976). But the rule of civil procedure governing findings was amended in 1985 to provide that:

> Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

Minn.R.Civ.P. 52.01.

The 1985 amendment to rule 52.01 effectively overruled *Great Northern*, because the rule does not distinguish between oral and documentary evidence. *First Trust Co. v. Union Depot Place Ltd. Prtshp.*, 476 N.W.2d 178, 181–82 (Minn.App.1991), *review denied* (Minn. Dec. 13, 1991). The evidence and its reasonable inferences must be viewed in the light most favorable to the prevailing party. *Id.* at 182. We will not overturn the trial court's findings of fact in support of a perma-

nent placement decision unless they are clearly erroneous, regardless of whether the findings are based on oral or documentary evidence.

■ As a threshold matter, the trial court must determine whether the conditions that led to the out-of-home placement have been corrected so that the child can return home. Minn.Stat. § 260.191, subd. 3b(a). If not, the trial court must then determine what permanent placement option is consistent with the child's best interests. *Id.* A permanent placement order must include the following detailed findings:

(1) how the child's best interests are served by the order;

(2) the nature and extent of the responsible social service agency's reasonable efforts, or, in the case of an Indian child, active efforts, to reunify the child with the parent or parents;

(3) the parent's or parents' efforts and ability to use services to correct the conditions which led to the out-of-home placement;

(4) whether the conditions which led to the out-of-home placement have been corrected so that the child can return home; and

(5) if the child cannot be returned home, whether there is a substantial probability of the child being able to return home in the next six months.

*Id.*, subd. 3b(e).

### A. Correction of conditions leading to out-of-home placement

■ With respect to appellants' efforts and ability to use services and whether the conditions which led to the out-of-home placement have been corrected, the trial court made the following findings: (1) the mother has shown only a minimal capacity to provide for the three children in the home; (2) the father has been unable and unwilling, partly due to employment, to assist in the parenting of these three children; (3) housekeeping services offered by the county were not properly used by the mother and were discontinued at her request; (4) the physical

condition of the home and surrounding environment are, at times, minimally acceptable, but concerns remain as to cleanliness and general safety; (5) the father did not complete the intensive parenting program or any similar program or resource that would assist him in becoming a more adequate parent; (6) the father was diagnosed with antisocial personality disorder; with a lack of motivation it will be difficult for the father to make required changes to improve his parenting skills; (7) the mother made reluctant efforts to comply with the September 9, 1994, disposition order, and compliance frequently consisted of participation only after frequently missed or cancelled appointments; and (8) appellants did not maximize their allowed visitation with A.R.G.–B. The record supports these findings.[1]

Appellants argue that significant progress was made in completing the case plan, pointing to the mother's successful participation in the intensive parenting program, the improvements to the parties' home, and the improved hygiene of the children and maintenance of the home. But the reports from the public health nurse and the in-home skills counselor show that appellants did not consistently maintain the cleanliness and safety of the home, as well as their own personal hygiene and the hygiene of the children. Appellants have not met A.R.G.–B.'s basic need for a consistently clean and safe environment. The record also shows that appellants likely would not maintain the regular medical care and follow-through that A.R.G.–B. needs. The letter from the children's doctor indicates that two of the three children in appellants' home are behind in their immunizations, and that all three children are behind on regular check-ups.

Appellants argue that the mother's delay in cooperating with services was excusable because it was caused by her grief over the male twin's death. Although the May 1995 psychological evaluation of the mother indicates she continues to have periodic bereavement reactions to the loss of the male twin, neither that evaluation nor the June 1995 psychiatric evaluation indicates any psychopathology or significant dysfunction. The

1. We note our concern for the other three children subject to these conditions.

mother also failed to take advantage of therapy for grief that was offered early in the reunification process, including individual counseling and group therapy. The record supports the trial court's finding that the mother made only reluctant efforts to comply with the reunification plan. There is no dispute that the father failed without excuse to complete any program that would assist him in becoming a more adequate parent.

## B. Reasonableness of the county's reunification efforts.

■ The statute defines "reasonable efforts" as the exercise of "due diligence" by the agency to use "appropriate and available services" to meet the needs of the child and the child's family. Minn.Stat. § 260.012(b) (1994). In determining whether reasonable efforts have been made, the court shall consider whether the services to the child and family were (1) relevant to the safety and protection of the child, (2) adequate to meet the needs of the child and family, (3) culturally appropriate, (4) available and accessible, (5) consistent and timely, and (6) realistic under the circumstances. *Id.* at (c). Whether the county has met its duty of reasonable efforts requires consideration of the length of time the county was involved and the quality of the effort. *In re Welfare of H.K.,* 455 N.W.2d 529, 532 (Minn.App.1990), *review denied* (Minn. July 6, 1990).

■ The record amply supports the trial court's finding that the county made reasonable efforts to reunite A.R.G.–B. with appellants. The court correctly found that services were provided to address issues related to the physical environment of appellants' home; appellants' ability to support the children; education of appellants as to proper discipline, nutrition, and hygiene of all family members; medical attention provided to the children; competent and appropriate babysitters for the children; and issues of mental health for both parents.

Appellants argue the county failed to provide housekeeping services as directed by the trial court's September 9, 1994, disposition order. The record shows the county provided services from two housekeepers, both of whom left because of the mother's lack of cooperation, and that appellants requested that a third housekeeper not be assigned. Appellants argue the county should have provided a third housekeeper in January 1995 when the mother indicated she was willing to accept another housekeeper. We hold that the duty to make "reasonable efforts" does not require the county to provide a third housekeeper, when the first two placements failed because appellants refused to take advantage of the service. Moreover, appellants did continue to receive services regarding housekeeping and organization of the home from the public health nurse and the in-home skills counselor.

Appellants contend the county improperly terminated reunification services before the September 27, 1995, permanent placement hearing. The mother participated in an intensive parenting class from July to September 1995, and the public health nurse's visits continued through September 1995. The record does not show that the county improperly terminated services.

## C. Six-month extension.

■ The trial court may extend the period for determination of permanent placement to "18 months after the child was placed in a residential facility" if (1) there is a substantial probability that the child will be returned home within the next six months or (2) the agency has not made reasonable efforts to correct the conditions that form the basis of the out-of-home placement or (3) extraordinary circumstances exist precluding a permanent placement determination. Minn.Stat. § 260.191, subd. 3b(b). A.R.G.–B.'s placement in a residential facility began on July 27, 1994, when she was placed in foster care. *See* Minn.Stat. § 257.071, subd. 1 (1994) ("residential facility" includes "family foster home"). The 12–month period after placement expired on or about July 27, 1995. Pursuant to section 260.191, subdivision 3b(b), the trial court could have extended the period for determination of permanent placement until approximately January 27, 1996, which was 18 months after placement.

The trial court properly found that the county made reasonable efforts to correct the

conditions that form the basis of the out-of-home placement. Appellants did not show any "extraordinary circumstances" precluding a permanent placement determination. But the trial court did not make a specific finding on whether there was a substantial probability that A.R.G.–B. would be returned home within the next six months. The statute requires a finding on this factor. Minn. Stat. § 260.191, subd. 3b(e)(5).

In effect, appellants received a partial extension of the permanent placement determination, because the placement hearing did not occur until September 27, 1995, and the trial court's order was not issued until November 28, 1995. By the time the trial court reviewed the record and the written materials submitted after the placement hearing and issued an order on November 28, 1995, permanency planning could have been delayed by only another two months. Because the trial court considered evidence that appellants still had not corrected conditions that led to the out-of-home placement within the potential six-month extension period, it appears the court implicitly found it was not substantially probable that A.R.G.–B. would be able to return home in the next six months. Under these circumstances, the trial court's failure to make the required specific finding is not reversible error.

### D. Best interests.

■ The paramount consideration in all proceedings concerning a child found to be in need of protection or services is the best interests of the child. Minn.Stat. § 260.011, subd. 2(a) (1994). In determining the appropriate permanent placement option, the trial court

> must be governed by the best interests of the child, including a review of the relationship between the child and relatives and the child and other important persons with whom the child has resided or had significant contact.

Minn.Stat. § 260.191, subd. 3b(c).

The trial court found that considering A.R.G.–B.'s extreme need for consistent medical care, attentive parenting, and a healthy environment, it would not be in A.R.G.–B.'s best interests to return her to appellants'

custody at this time. The court found that A.R.G.–B.'s best interests require her permanent placement with the maternal grandparents.

Appellants argue that A.R.G.–B. currently does not have extreme medical needs, pointing out that apnea monitoring is no longer required. Although A.R.G.–B. has made significant progress under the maternal grandparents' care, the report of the special education teacher shows that A.R.G.–B. needs intervention and close monitoring to ensure that her progress continues. The record supports the trial court's finding that A.R.G.–B. has an extreme need for consistent medical care, attentive parenting, and a healthy environment.

Appellants argue they should not be deprived of the opportunity to parent A.R.G.–B. simply because the maternal grandparents have more time and money to devote to her care. But the record shows that appellants' failure to provide an appropriate environment for A.R.G.–B. results from their mismanagement of the resources they have and their failure to utilize services provided by the county, rather than from a lack of resources.

The trial court properly found that A.R.G.–B.'s best interests are served by placement with her maternal grandparents, who have provided excellent care for A.R.G.–B. for most of her young life and with whom A.R.G.–B. is closely bonded. Unlike a termination of parental rights proceeding, the award of physical and legal custody to the maternal grandparents does not preclude appellants from maintaining a relationship with A.R.G.–B. through visitation. Moreover, appellants may seek modification of the custody award in the future under appropriate circumstances. *See* Minn.Stat. § 260.191, subd. 3b(f) (an order for permanent legal and physical custody of a child may be modified under sections 518.18 and 518.185).

### DECISION

The trial court's permanent placement order is supported by clear and convincing

evidence that appellants did not correct the conditions leading to the child's out-of-home placement, the county made reasonable efforts to reunite the family, and the child's best interests are served by an award of physical and legal custody to the maternal grandparents.

**Affirmed.**