*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0800**

In the Matter of the Welfare of the Child of:
J.W. and M.T.,
Parents (A15-0800),
J.W. and J.O.,
Parents (A15-0801),
J.W. and J.D.,
Parents (A15-0802),
and
J.W. and M.T.,
Parents (A15-0824).

**Filed December 7, 2015
Affirmed
Reyes, Judge**

Lyon County District Court
File Nos. 42JV155; 42JV14128; 42JV156
42JV157; 42JV158

Kayla M. Johnson, Smith & Johnson, Slayton, Minnesota (for appellant J.W.)

Daniel L. Giles, Stoneberg, Giles & Stroup, P.A., Marshall, Minnesota (for appellant J.D.)

Richard R. Maes, Lyon County Attorney, Nicole A. Springstead, Assistant County Attorney, Marshall, Minnesota (for respondent)

Betty Schoephoerster, Marshall, Minnesota (guardian ad litem)

M.T., Clara City, Minnesota (pro se respondent)

Considered and decided by Peterson, Presiding Judge; Halbrooks, Judge; and Reyes, Judge.

**REYES**, Judge

In this consolidated action, appellant mother J.W. challenges the transfer of legal custody of A.T. to M.T. and further challenges the termination of her parental rights to C.O. and J.D.-child. Appellant father J.D. challenges the termination of his parental rights to J.D.-child. We affirm.

## FACTS

Appellant J.W. is the mother of three children, A.T., C.O., and J.D.-child, the subjects of this action. Each child has a different birth father. A.T.'s father, M.T., signed a recognition of parentage. C.O.'s father, J.O., was adjudicated the father of C.O., but has been deceased throughout these proceedings. J.W. was married to D.W. at the time J.D.-child was conceived and born on November 13, 2013. D.W. was the presumptive father of J.D.-child. But, according to a report dated September 5, 2014, and filed with the court on October 15, 2014, the probability that appellant J.D. is the father of J.D.-child is 99.99%. J.D. signed a recognition of parentage sometime around February 2015.

On August 9, 2014, when J.D.-child was returned to J.W.'s care after spending the weekend with J.D., J.W. observed that J.D.-child's breathing was abnormal, her "eyes were unusual," and she had feces on her. J.W. also noticed that J.D.-child's head appeared to be enlarged. J.W. took J.D.-child to the hospital emergency room in Marshall, Minnesota. There, J.D.-child was examined and transferred to another hospital in Sioux Falls, South Dakota. Dr. Timothy Michals was the physician who examined J.D.-child and performed a variety of scans on her. Based on the scans, Dr. Michaels

concluded that J.D.-child experienced subdural hematomas, a collection of blood in the brain; swelling of the head and was collecting fluid around her brain; the injuries were not accidental and were caused by shaking; there appeared to be injuries caused on a prior occasion; the nature of the injuries indicated that they were the result of abuse; the resulting condition is a permanent injury that will require on-going care; and, as a result, J.D.-child may be speech-delayed and may experience some learning disabilities.

On July 7, 2014, approximately one month prior to the August 9 incident, J.W. took J.D.-child to the doctor because she was fussy and irritable. The child had a follow-up appointment on July 8, 2014. J.D.-child had a second follow-up appointment scheduled for July 11, 2014, but the child was a no-show for that visit. The timeframes for these visits are within the date range that the doctor suggested that [J.D.-child's] earlier injuries could have occurred.

While the children were in J.W.'s care, they were exposed to several "individuals whose past behaviors made them dangerous to the children." One of these individuals, R.A., lived in the home with the children for several months. R.A. has prior criminal-sexual-conduct convictions. R.A. also allegedly assaulted his own son, though he ultimately pleaded guilty to a charge of disorderly conduct. K.L., an individual convicted of felony-level domestic assault, lived in J.W.'s home for two weeks while the children were in her care. J.D. also resided with J.W. and the children after the birth of J.D.-child. J.D. has been convicted of domestic assault and felony stalking. J.W. was the victim in both cases. J.D.'s threats and statements to J.W. included, "that he knew what she was

doing and walls don't stop bullets." Finally, J.M., another individual who lived in J.W.'s home with the children, had served time in prison for drug offenses.

The children have been in out-of-home placements since September 4, 2014. C.O. and J.D.-child were in foster care at the time of trial. A.T. has been residing with her father, M.T., since November 17, 2014. A.T. is seemingly doing quite well in M.T.'s care. M.T.'s girlfriend, J.A., enrolled A.T. in the MacCray School District. At the time of trial, A.T. was in fourth grade and was placed in the same class as her best friend and neighbor. A.T. was doing well in school and participating in extracurricular activities. M.T. works as a truck driver. While his schedule is busy, he does have some flexibility. M.T.'s girlfriend and parents are also very supportive in helping to care for A.T.

As part of her court-ordered case plan, J.W. was to follow all of the recommendations of her parenting evaluation. One of these recommendations was that J.W. obtain and maintain safe and adequate housing. J.W. was evicted from her apartment on January 1, 2015. At the time of trial, J.W. was residing with her high-school friend's father. J.W. testified that, if she regained custody of her children, she had suitable housing options available to her. But J.W.'s testimony also indicated that those options were not immediately available.

Part of J.W.'s case plan included that she continue to monitor her mental-health needs and cooperate with an adult mental-health case manager to do so. J.W. never obtained an adult mental-health case manager. However, J.W. did meet weekly with her therapist. J.W.'s therapist testified that she felt J.W. was making good progress, was stable, gaining insight into her relationship patterns, and developing coping mechanisms.

4

But there were also indications that J.W. was continuing to struggle with her issues related to self-worth, self-esteem, and co-dependency. As part of her case plan, J.W. was ordered to have no contact with R.A. or J.D. J.W. continued to be in contact with J.D. J.D. was arrested for violation of the no-contact order and was in jail at the time of trial.

The district court concluded that the transfer of legal custody of A.T. to M.T. and the termination of J.W.'s parental rights to C.O. and J.D.-child was appropriate based on the best interests of the child and statutory requirements. The district court also concluded the termination of J.D.'s parental rights to J.D.-child was appropriate based on the best interests of the child and statutory requirements. This appeal follows.

## D E C I S I O N

**I.  The district court did not err when it transferred legal custody of A.T. from J.W. to father M.T.**

When reviewing an order transferring legal custody, this court determines "whether the trial court's findings address the statutory criteria and are supported by substantial evidence, or whether they are clearly erroneous." *In re Welfare of A.R.G.-B.*, 551 N.W.2d 256, 261 (Minn. App. 1996) (quotation omitted). Under Minn. Stat. § 260C.513(a) (2014),

> Termination of parental rights and adoption, or guardianship to the commissioner of human services through a consent to adopt, are preferred permanency options for a child who cannot return home. If the court finds that termination of parental rights and guardianship to the commissioner is not in the child's best interests, the court may transfer permanent legal and physical custody of the child to a relative when that order is in the child's best interests.

*See also* Minn. Stat. § 260C.515, subd. 4 (2014). "Best interests of the child" means "all relevant factors to be considered and evaluated." Minn. Stat. § 260C.511(a) (2014). Further, under Minn. Stat. § 260C.517(a) (2014), an order that permanently places a child out of a parent's home must include the following detailed findings:

> (1) how the child's best interests are served by the order;
> (2) the nature and extent of the responsible social services agency's reasonable efforts or, in the case of an Indian child, active efforts to reunify the child with the parent or guardian where reasonable efforts are required;
> (3) the parent's or parents' efforts and ability to use services to correct the conditions which led to the out-of-home placement; and
> (4) that the conditions which led to the out-of-home placement have not been corrected so that the child can safely return home.

J.W. argues that, with respect to A.T., the district court erred as to its best-interests findings, and the court failed to make the fourth required permanency finding under Minn. Stat. § 260C.517(a). We address each argument in turn.

**A.    The district court's best-interests determination regarding transferring legal custody of A.T. from J.W. to M.T. was not clearly erroneous.**

J.W. argues that the district court erred because it failed to make adequate best-interests findings regarding transferring custody of A.T. to M.T. and that the findings made were not supported by the record. Specifically, J.W. argues that the district court erred because it did not make any findings regarding the relationship between A.T. and her half siblings and by concluding that A.T. has a "strong bond in relationship" with M.T.'s extended family but not J.W.'s. We are not persuaded.

6

While the district court did not comment on A.T.'s relationship with her half siblings or J.W.'s extended family in its best-interests analysis, the court made comprehensive findings on why transferring custody of A.T. to M.T. is in A.T.'s best interest. The court noted that M.T. has a suitable family home; M.T. has a stable relationship with his girlfriend J.A.; M.T. and A.T. have a positive relationship; A.T. has a good relationship with J.A.; A.T. was thriving while in M.T.'s care; and M.T. was working to minimize any disputes with J.W. These findings are supported by the record. Thus, the district court's findings regarding the best-interests factors and transferring permanent legal and physical custody of A.T. to M.T. satisfied the statutory criteria and are supported by substantial evidence.

**B.** **The district court's order transferring legal custody of A.T. to M.T. satisfies Minn. Stat. § 260C.517(a)(4), as the conditions which led to the out-of-home placement had not been corrected.**

J.W. also argues that the district court failed to make one of the required permanency findings under Minn. Stat. § 260C.517(a), namely, that the conditions which led to the out-of-home placement have not been corrected so that the child can safely return home. We disagree.

The district court made several findings regarding J.W., her housing situation, and her parenting abilities, some of which include:

> 12.1.3 That [J.W.] had a lease for the year 2014 on a home and never paid the rent on time. That [J.W.] was evicted after the end of the 2014 lease.

> 12.1.4 That [J.W.]'s current housing is that she lives with a friend.

7

12.1.5 That [J.W.] testified to a plan by which she may be able to provide housing if the children were returned to her care. [J.W.] did not act to implement this plan in any way. [J.W.] does not have an ability to provide the children with safe, stable, and secure housing at this time.

12.1.6 That [J.W.]'s plan is not that she would provide housing, but that her mother and stepfather would make a house available for her and the children to live in. There is no indication that the owners agree to this. There has been no action to implement such a plan.

12.1.7 That [J.W.] is not able to provide housing at this time.

12.3.1 That [J.W.] was not forthcoming about allowing access to her home. On the only occasion when individuals had the opportunity to enter the home, the home was observed to be a mess and dirty.

12.9.1 That [J.W.] has a diagnosis of Major Depressive Disorder, has a history of being diagnosed with Post Traumatic Stress Disorder, and is currently prescribed anti-depressants.

12.9.2 That [J.W.] was on medication for mental health issues following the suicide of [C.O.]'s father.

12.9.3 That [J.W.] knew that she had been requested to provide a list of medications and that she had not done so.

12.9.5 That [J.W.] has a history of three to four psychiatric hospitalizations.

While the district court did not explicitly state in the permanency order that the conditions which led to A.T.'s out-of-home placement were not corrected, the order as a whole satisfies that statutory requirement. All of the above-noted findings support the conclusion that the conditions which led to A.T.'s out-of-home placement have not been corrected so that A.T. can safely return home. The main conditions which led to the

8

children's out-of-home placement were the abuse that J.D.-child, A.T.'s half sibling, suffered while in J.W.'s care; the potentially dangerous persons who J.W. allowed to reside with her and her children; and J.W.'s mental-health issues.

At the time of trial, J.W. had not demonstrated that she had resolved her housing situation. J.W. was residing with a high-school friend's father. J.W. testified that she had housing options available to her and that no one would be living in the home aside from her and her children. However, J.W.'s testimony also indicated that the housing options were not immediately available to her. Given J.W.'s history and housing situation at trial, it was not an abuse of discretion for the district court to discount J.W.'s testimony that she would have suitable housing once it was necessary. *In re Welfare of Children of J.B.*, 698 N.W.2d 160, 163 (Minn. App. 2005) ("[T]he weight to be given testimony of [a] witness is [ultimately] within the province of the trial judge as fact-finder.").

J.W. further argues that the district court's finding that she was struggling with mental health issues was clearly erroneous. J.W. asserts that her mental health was stable, she was complying with her mental health treatment program, gaining insight, and developing coping mechanisms. Testimony from J.W.'s therapist supports these assertions. However, the record also supports the conclusion that J.W. is still grappling with issues related to self-worth, self-esteem, and co-dependency. Both J.W.'s therapist and J.W. herself testified that J.W. continues to struggle with whether and how to respond to J.D.'s attempts to contact her. This is significant, particularly given the connection between J.W.'s mental-health issues and her inability to provide a safe environment for

9

her children. Thus, the district court's finding that J.W. was still struggling with mental-health issues is supported by the evidence and is not clearly erroneous.

## II.     The district court did not err when it terminated J.W.'s parental rights to C.O. and J.D.-child.

Courts presume that natural parents are fit to care for their children, and "[p]arental rights may be terminated only for grave and weighty reasons." *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 87 (Minn. App. 2012) (quotation omitted). The petitioning county bears the burden of proving at least one of the statutory grounds for termination by clear and convincing evidence. *See* Minn. Stat. § 260C.301, subd. 1(b) (2014). Whether to terminate parental rights is discretionary with the district court. *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 136 (Minn. 2014). "[O]n appeal from a district court's decision to terminate parental rights, we will review the district court's findings of the underlying . . . facts for clear error, but we review its determination of whether a particular statutory basis for involuntarily terminating parental rights is present for an abuse of discretion." *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012); *see* Minn. Stat. § 260C.301, subd. 1(b) (listing bases for terminating parental rights). We will affirm the district court's decision if any of the statutory grounds for termination are supported by clear and convincing evidence and termination of parental rights is in the child's best interests. *In re Children of T.R.*, 750 N.W.2d 656, 661 (Minn. 2008). We give considerable deference to the district court's decision because it is "in a superior position to assess the credibility of witnesses." *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996).

**A.    The district court did not err in finding that the county proved at least one of the statutory grounds for termination.**

J.W. asserts that the district court clearly erred in finding that the county proved the grounds for termination under Minn. Stat. § 260C.301, subd. 1(b)(2). We disagree.

Under Minn. Stat. § 260C.301, subd. 1(b)(2), the district court may terminate parental rights if it finds "that the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship." Failure to satisfy key elements of the court-ordered case plan "provides ample evidence" of noncompliance "with the duties and responsibilities of the parent-child relationship." *In re Child of Simon*, 662 N.W.2d 155, 163 (Minn. App. 2003) (quotation omitted). A key element of J.W.'s case plan, which she failed to satisfy, was obtaining secure, safe, and stable housing for herself and the children. The parental capacity evaluator opined "that none of the children should be returned to [J.W.] unless she would be able to demonstrate that she has the resources to care for the children in a stable home environment in which they can thrive."

As previously noted, J.W. failed to demonstrate her ability to provide appropriate housing for herself and her family. In fact, J.W.'s living situation arguably worsened during the time she was receiving assistance from the county, as she was evicted from her apartment and moved in with a friend. *See In re Welfare of Child of D.L.D.*, 865 N.W.2d 315, 324 (Minn. App. 2015) ("That the factual bases for the condition at the time of the adjudicatory hearing were not identical to the factual bases for the condition at the time of removal does not undermine the . . . court's statutory finding that the overall condition

11

had not been corrected."), *review denied* (Minn. July 20, 2015). Furthermore, the record reflects that J.W. was still struggling with some of the mental-health issues that put the children at risk while in her care. J.W. failed to demonstrate that she would be able to refrain from engaging in abusive relationships in the future. This evidence establishes that J.W. is unable to address the children's physical, mental, and emotional needs now and in the reasonably foreseeable future. Therefore, the district court's findings under this statutory criterion are supported by substantial evidence and are not clearly erroneous.

If a single statutory basis for terminating parental rights is affirmable, this court need not address any other statutory bases the district court may have found to exist. *In re Children of T.A.A.*, 702 N.W.2d 703, 708 n.3 (Minn. 2005). Therefore, because we affirm the district court's findings as to Minn. Stat. § 260C.301, subd. 1(b)(2), we need not address J.W.'s arguments regarding the other statutory grounds for termination. Minn. Stat. § 260C.301, subd. 1(b)(4), (6), (5), and (8).

**B.    The district court did not err when it determined that terminating J.W.'s parental rights was in C.O. and J.D.-child's best interests.**

J.W. argues that, in analyzing the best-interests factors, the district court failed to take into account the children's relationships with one another and with members of J.W.'s family. J.W.'s argument is unavailing.

We review a district court's best-interests decision for abuse of discretion. *J.R.B.*, 805 N.W.2d at 905. The children's best interests are "the paramount consideration in every termination case." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn. 1990);

12

*see* Minn. Stat. § 260C.301, subd. 7 (2014) ("In any proceeding under this section, the best interests of the child must be the paramount consideration."). The Rules of Juvenile Protection require the district court to conduct the following best-interests analysis before terminating a parent's rights to a child:

> [T]he court shall make a specific finding that termination is in the best interests of the child and shall analyze:
>
> (i)     the child's interests in preserving the parent-child relationship;
> (ii)    the parent's interests in preserving the parent-child relationship; and
> (iii)   any competing interests of the child.

Minn. R. Juv. Prot. P. 39.05, subd. 3(b)(3). The district court "must balance the preservation of the parent-child relationship against any competing interests of the child." *In re Welfare of Children of K.S.F.*, 823 N.W.2d 656, 668 (Minn. App. 2012). "Competing interests include such things as a stable environment, health considerations and the child's preferences." *Id.* (quotation omitted). "Where the interests of parent and child conflict, the interests of the child are paramount." Minn. Stat. § 260C.301, subd. 7.

The court provided detailed findings of fact to support its legal conclusion that it is in the best interests of the children to terminate J.W.'s parental rights. J.W. asserts that the children have a "significant interest" in maintaining their relationship with her. However, the district court noted that J.W. failed to demonstrate her ability to parent the children at the time of trial. Specifically, the court made extensive factual findings regarding J.W.'s continued problems with providing a safe, secure environment for her children. *See In re Welfare of D.L.R.D.*, 656 N.W.2d 247, 251-52 (Minn. App. 2003)

13

(holding that district court's extensive factual findings, which were supported by substantial evidence, provided sufficient justification for its best-interests determination). As previously noted, J.W. did not have permanent housing at the time of trial, and there were indications that she was still engaging in some of the self-destructive patterns that put her children at risk.

J.W. next asserts that she too has a "significant interest" in preserving the parent-child relationship. But the district court found that J.W. missed several scheduled visits, reduced the frequency of her visits with the children, and moved further away from the children. Moreover, the district court found that during visitation, J.W. struggled with the children and often was not attentive to their needs. These findings are supported by the record.

Finally, with respect to the competing interests of the children, J.W. asserts that her children's relationship with one another as well as their relationships with her extended family show that terminating her parental rights is not in the children's best interests. However, consistent with the opinions offered by the guardian ad litem and social worker, the district court implicitly concluded that the competing interests of the children, such as a stable living environment and the children's health considerations, weighed in favor of terminating J.W.'s parental rights. *K.S.F.*, 823 N.W.2d at 668 (discussing district court's finding that children need safe and stable home as supporting conclusion that termination of parental rights was in children's best interests); *J.R.B.*, 805 N.W.2d at 905 (affirming district court's decision to terminate parental rights on basis that children's need for stability outweighed considerations of extended-family

14

relationships and support systems). This conclusion is supported by the record, and the court's failure to explicitly address the interrelationships between J.W.'s children and the children's relationships with J.W.'s extended family was not an abuse of discretion.

**III.    The district court did not err when it terminated J.D.'s parental rights to J.D.-child.**

As previously noted, we will affirm the district court's decision if any of the statutory grounds for termination are supported by clear and convincing evidence and termination of parental rights is in the child's best interests. *T.R.*, 750 N.W.2d at 661. J.D. does not challenge the district court's best-interests findings. Rather, J.D. contends that the district court incorrectly concluded that the county made reasonable efforts to rehabilitate and reunify him with his child.[1] We disagree.

Before parental rights may be terminated, clear and convincing evidence must show that the county made reasonable efforts to reunite the family. *T.A.A.*, 702 N.W.2d at 708. In the case of noncustodial parents, "reasonable efforts" at reunification require a social-services agency to exercise due diligence in "assess[ing] a noncustodial parent's ability to provide day-to-day care for the child and, where appropriate, provid[ing] services necessary to enable the noncustodial parent to safely provide the care." Minn. Stat. § 260.012(e)(2) (2014). Services must "go beyond mere matters of form so

---

[1] J.D. also argues that his rights were terminated solely because J.W.'s rights were terminated and that the district court erred in its determination as to J.W. J.D. does not have standing to make arguments regarding whether the district court erred in its determination as to J.W. *J.R.B.*, 805 N.W.2d at 906 (stating that "[g]enerally, 'one does not have standing to assert the constitutional rights of a third party'") (quoting *In re Welfare of R.L.K.*, 269 N.W.2d 367, 372 (Minn. 1978)), *review denied* (Minn. Jan. 6, 2012).

15

as to include real, genuine assistance" to enable the parent to overcome the conditions that led to the child's out-of-home placement. *In re Welfare of Children of S.W.*, 727 N.W.2d 144, 150 (Minn. App. 2007), *review denied* (Minn. Mar. 28, 2007). But services need not be provided if they would be futile. *In re Welfare of S.Z.,* 547 N.W.2d 886, 892 (Minn. 1996).

The district court found that the county made reasonable efforts to rehabilitate and reunite J.D. with J.D.-child through the county's provision of case management, foster care for J.D.-child and her siblings, and a referral for J.D. for supervised parenting time. J.D., however, was uncooperative and failed to comply with the case plan. J.D. did not participate in the Family Group Decision Making Conference. J.D. did not complete domestic abuse treatment, a chemical use assessment, a diagnostic assessment, or a licensing request for his home. J.D. attended only half of the scheduled visitations with J.D.-child. Finally, J.D. did not provide the social worker or guardian ad litem with a valid address and failed to attend court hearings and scheduled meetings.

J.D. asserts that the county's contact with him was minimal "until after the paternity testing was completed in late October 2014." J.D. also argues that he was not "aware of the timeframe within which he was required to complete all of the tasks in the case plan," and social services should have done more to impress upon him the urgency with which the case plan requirements should have been completed. But it was J.D.'s failure to participate in the intake process at New Horizons Crisis Center that delayed J.D.'s first visit until November 1, 2014. And subsequently, J.D. "failed to exercise visitation" for a 28-day period. Moreover, J.D. did not request additional assistance in

completing his case-plan requirements. Overall, J.D. failed to put forth much of any effort into his rehabilitation and reunification plan. *See J.R.B.*, 805 N.W.2d at 904 (concluding that, even if the county had other services that would have been helpful, it was not error to conclude that the county made reasonable efforts when father failed to respond to services offered and failed to offer an explanation for why he would be more likely to respond to an offer of other services). Accordingly, clear and convincing evidence supports the district court's finding that the services were appropriate, adequate, and relevant to facilitate a reunion.

**Affirmed.**