**In the Matter of the WELFARE OF B.L.W.**

**No. CO–86–237.**

Court of Appeals of Minnesota.

Nov. 4, 1986.

William E. Falvey, Ramsey County Public Defender, Margaret L. Arola, Sp. Asst. Public Defender, St. Paul, for appellant.

Tom Foley, Ramsey Co. Atty., Steven C. DeCoster, Asst. Co. Atty., St. Paul, for respondent.

J. Thomas Mott, Asst. Public Defender, St. Paul, for guardian ad litem.

Considered and decided by RANDALL, P.J., and LANSING and HUSPENI, JJ., with oral argument waived.

## OPINION

LANSING, Judge.

Ramsey County Community Human Services Department (RCCHSD) successfully petitioned to terminate the parent-child relationship between appellant Pamela Stokke and her son, B.L.W. Stokke appeals the termination order, contending it is not supported by clear and convincing evidence. We affirm the order.

## FACTS

Stokke's contacts with social service agencies began before B.L.W.'s birth. During her pregnancy, she met regularly with a public health nurse, a pregnancy counselor, and a social worker affiliated with the St. Paul-Ramsey Medical Center. Stokke has a seizure disorder, is mildly mentally retarded, and lacks independent living skills. The social worker believed these factors put Stokke at high risk for abusing or neglecting her child and referred Stokke to RCCHSD at B.L.W.'s birth in October 1983. Judith Brumfield, a social worker in the child protection unit, was assigned to work with Stokke.

Brumfield's first visit occurred three weeks after B.L.W.'s birth. Stokke and B.L.W. were living with B.L.W.'s adjudicated father, M.W. Stokke made no positive statements about B.L.W. and indicated to Brumfield that she did not want the baby. In a later visit with both parents, M.W. told Brumfield that, although he had not wanted B.L.W., he was very opposed to placement.

During the fall of 1983, B.L.W. was frequently left in the care of his maternal grandmother. Several times M.W. and Stokke left B.L.W. unattended in their apartment. Brumfield observed no signs

of nurturing between either parent and B.L.W. The parents' relationship with each other was unstable, and Stokke twice obtained orders for protection because of M.W.'s physical violence. Stokke eventually separated from M.W. and moved with B.L.W. to her mother's home.

B.L.W.'s grandmother assumed his primary care. The public health nurse visited her daily and Brumfield visited twice a week. Since birth, B.L.W. has exhibited a number of health and developmental problems. He has been diagnosed as suffering from fetal dilantin syndrome, apparently caused by Stokke's overdose of anti-seizure medication resulting in hospitalization during her pregnancy. B.L.W. also has substantial feeding problems. In April 1984 he was determined to be developmentally delayed and was assigned a special educator who visits weekly. Although the county initially considered B.L.W.'s grandmother a parenting resource, it became increasingly apparent to Brumfield that she lacked the commitment to care for his special needs.

Brumfield observed B.L.W.'s development was being further delayed due to inadequate nurturing, stimulation, and care. On that basis, RCCHSD petitioned for a neglect and dependency order. Following a hearing in August 1984, the court found B.L.W. neglected and dependent as to both parents within the meaning of Minn.Stat. § 260.015, subds. 6(d) and 10(b), (c) (1984). RCCHSD received temporary custody. B.L.W. was placed in the foster home of Shirley McKelvey, who specializes in emotionally disturbed children.

Separate case plans were developed for Stokke and M.W. On Brumfield's advice, Stokke became involved with the Nekton In-Home Services Program, which assists mentally retarded parents. Her case plan required that she continue with this program. In October 1984 Stokke moved into McKelvey's foster home with B.L.W. to receive hands-on training and role modeling in parenting. Stokke did not understand part of her original case plan and it was revised to specifically set out her responsibilities. Stokke was expected to feed and care for B.L.W. during his waking hours, and McKelvey was responsible for general meal preparation and housekeeping. Problems developed immediately; B.L.W. regressed socially and behaviorally when around his mother, and Stokke did not want to feed him because it was difficult and time-consuming. McKelvey resumed feeding B.L.W. in January 1985.

In accordance with her case plan, Stokke also completed a psychological assessment and evaluation of parenting skills. Stokke's full-scale I.Q. score at 71 placed her in the "borderline to mildly mentally retarded range of functioning" and indicates "a significant handicapping condition." Academically, Stokke functions at a fourth-grade level.

Dr. Farseth, a licensed consulting psychologist, observed Stokke with B.L.W. and noted that she lacked understanding of his developmental level. Dr. Farseth concluded that a serious problem existed in Stokke's parenting ability because her emotional immaturity, dependence, low ability, and confusion made her and those in her care very vulnerable.

In Dr. Farseth's opinion, the program "at the foster home is * * * the one that would best give [Stokke] the opportunity to acquire parenting skills." Dr. Farseth also indicated that

[B.L.W.] is approaching an age when permanent planning needs to be done. If substantial growth and progress is not shown very soon in [Stokke's] ability to become [B.L.W.'s] primary caretaker with respect to physical care and emotional needs, termination should be considered. This is especially crucial because [Stokke] has been with [B.L.W.] nearly continuously since his birth, and yet has not shown substantial progress.

In February 1985 Stokke confirmed that she was again pregnant and intended to leave the foster home and live with the expected child's father. Stokke was told that if she moved out of Ramsey County, Nekton would drop her from their program and the county would seek to terminate her

parental rights if she abandoned B.L.W. and failed to comply with her case plan. Despite this knowledge, Stokke rejected referrals to other adult foster homes and moved to Minneapolis in May 1985, leaving B.L.W. in McKelvey's care. Stokke's counselor at Nekton stated that although Stokke genuinely cared for B.L.W., her questionable ability to care for herself independently raised grave concerns about her ability to care for a dependent child.

In July 1985 Stokke's case was transferred to RCCHSD social worker Gordon Dean. Brumfield prepared a petition for termination of Stokke's parental rights and filed it in August 1985. After the petition for termination was drawn, no new case plan was prepared and RCCHSD made no further attempts to provide services or reunite Stokke and B.L.W.

During the summer and fall of 1985, Stokke called Dean approximately twice a month, usually about her Supplemental Security Income payments, which RCCHSD provided. She occasionally asked about B.L.W. and regularly visited him for two hours a week. In August 1985 she requested more visitation, which was arranged on Mondays at the place where B.L.W. was attending preschool. Between August and November, Stokke made only two visits.

When the petition for termination was filed, the court appointed Wendy Currey guardian ad litem. Currey observed B.L.W. with the preschool staff, his foster mother, and Stokke. In October 1985 she reported that B.L.W. "continues to adjust well in the McKelvey home" and "shows signs of attachment and affection to his foster mother." B.L.W.'s preschool counselor/teacher evaluated his progress as significant.

Currey also observed that B.L.W. "tends to regress in his mother's presence" and that his mother "is unable to provide appropriate and nurturing responses to [B.L. W.'s] needs." Stressing the importance of permanent placement for B.L.W., his need for special supervised care, and Stokke's expressed disinterest in parenting, Currey concluded that termination of Stokke's parental rights would be in B.L.W.'s best interests.

At the evidentiary hearing in November 1985, McKelvey testified that although Stokke visited almost weekly and called when she could not make it, during these visits Stokke snacked or watched TV and did not significantly interact with B.L.W. McKelvey testified that she does not believe Stokke has the capacity to be a parent to B.L.W. Brumfield testified that Stokke refused or neglected to comply with the duties of her parental relationship and that all possible efforts had been made to correct the situation. Stokke's mother testified that she believed her daughter had the ability to raise B.L.W.

The trial court issued findings and an order terminating Stokke's parental rights. Stokke appeals.

## ISSUE

Does the evidence clearly and convincingly sustain the trial court's order of termination?

## ANALYSIS

■ In termination of parental rights proceedings, the petitioner has a heavy burden of proving by clear and convincing evidence that there are statutory grounds for issuance of the order. *In re Welfare of Kidd,* 261 N.W.2d 833, 835 (Minn.1978). The evidence supporting the findings must address conditions existing at the time of the hearing; it must further appear that those conditions will continue for a prolonged, indeterminate period. *In re the Welfare of Chosa,* 290 N.W.2d 766, 769 (Minn.1980).

After making careful and thorough findings, the trial court ordered that Stokke's parental rights be terminated based on the following statutory grounds:

(2) That the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, including but not limit-

ed to providing the child with necessary food, clothing, shelter, education, and other care and control necessary for the child's physical, mental or emotional health and development, if the parent is physically and financially able; or

\* \* \* \* \* \*

(5) That following upon a determination of neglect or dependency, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination[.]

Minn.Stat. § 260.221(b)(2) and (5) (1984).

Stokke contends that the evidence does not clearly and convincingly demonstrate her unwillingness or incapacity to parent. She also contends she was not given a consistent program to follow and RCCHSD did not make reasonable efforts to correct the conditions of dependency and neglect. Specifically, she claims that RCCHSD's efforts did not take into account her special circumstance of mental retardation.

■ The evidence supporting Stokke's inability or unwillingness to parent is extensive. Although Stokke made some efforts to feed and properly clothe B.L.W. while she stayed with him in the foster home, the overwhelming weight of the evidence supports the trial court's finding that Stokke failed to understand B.L.W.'s special needs, failed to accomplish the objectives of her case plan and, even more basically, failed to demonstrate a sincere desire to parent B.L.W. on a permanent basis.

The record further demonstrates that Stokke's desire and ability to parent B.L.W. have not changed since she moved from McKelvey's home. McKelvey, guardian ad litem Currey and social worker Dean all had contacts with Stokke during the fall of 1985 and testified to Stokke's continued lack of emotional attachment to B.L.W. Although the evidence of the conditions at the time of the hearing could be more complete, it nonetheless shows that Stokke's attitude and performance remain unchanged.

As the trial court found, every appropriate, intensive, community-based resource has been used in an attempt to enable Stokke to establish a parent-child relationship with B.L.W. and to assist her in learning necessary parenting skills: the use of a public health nurse, Children's Home Society counseling, St. Paul-Ramsey Medical Center's Maternal and Infant Care Project, Ramsey County Infant Program, Nekton In-Home Program, 24–hour teaching foster home for mother and child, and professional and experienced social workers. RCCHSD, under the direction of the court, made more than reasonable efforts to correct the conditions which originally led to the determination of neglect and dependency.

■ A parent's rights cannot be terminated solely due to his or her mental retardation or illness. *In re the Welfare of J.J.B.*, 390 N.W.2d 274 at 281; *In re the Welfare of K.M.T.*, 390 N.W.2d 371, 373–74 (Minn.Ct.App.1986). If, however, the mental illness or other mental or emotional disability precludes that parent from providing proper parental care and defeats all reasonable efforts to remedy the conditions which led to a determination of dependency and neglect, the statutory requirement for termination has been met. *J.J.B.*, 390 N.W.2d at 281 (citing Minn.Stat. § 260.-221(b)(5) (1984)).

Stokke's intellectual limitations required careful planning to fashion a program which would meet her special needs. The record amply establishes that RCCHSD's efforts were designed to meet Stokke's limitations. Both Dr. Farseth and social worker Brumfield indicated that Stokke's stay in the foster home afforded her the best possible opportunity to learn parenting skills. Stokke's inability or unwillingness to progress was apparent, and the foster mother remained B.L.W.'s primary caretaker even while Stokke was present. When Stokke decided to leave the foster home, she rejected any further attempts by RCCHSD to refer her to other programs.

The intensive involvement of the social service agencies and the marked lack of any success toward a goal of uniting B.L.W. with his mother compel a conclusion

that unification is not reasonably foreseeable. The evidence also compels a conclusion that permanent placement of B.L.W. is crucial to his progress and that any delay would not be in his best interests. *See In re the Welfare of J.J.B.*, 390 N.W.2d 274, 279 (Minn.1986).

As the trial court stated in its findings of fact:

41. [Stokke] does not now, nor will she in the reasonably foreseeable future have both the sincere desire and the ability to be a proper parent to [B.L.W.] who can meet both his normal and his special needs.

It is true that [Stokke] feels affection and expresses feelings of love for [B.L.W.] but those are not enough to make her the parent [he] needs, and they have never been enough to provide [Stokke] with the incentive to properly care for [B.L.W.].

42. It is in [B.L.W.'s] best interests that [Stokke's] parental rights be terminated and those interests outweigh [Stokke's] interests in wishing to maintain the parent-child relationship in name only.

[B.L.W.'s] developmental progress increases and psychological stresses on him decrease in [Stokke's] absence. Visitation by her, without a child-parent bond or attachment, does not offer a compensating benefit.

### DECISION

The trial court's decision terminating the parent-child relationship between Stokke and B.L.W. is affirmed.

Affirmed.