*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0545**

In the Matter of the Welfare of
the Child of: N. U. M., Parent.

**Filed August 29, 2016
Affirmed
Johnson, Judge**

Hennepin County District Court
File No. 27-JV-15-2404

Mary F. Moriarty, Hennepin County Public Defender, Paul J. Maravigli, Assistant Public Defender, Minneapolis, Minnesota (for appellant-mother)

Michael O. Freeman, Hennepin County Attorney, Kacy Wothe, Assistant County Attorney, Minneapolis, Minnesota (for respondent Hennepin County Human Services and Public Health Department)

Erin C. Wacker, ECW Law PLLC, Minneapolis, Minnesota (for respondent guardian ad litem)

Considered and decided by Halbrooks, Presiding Judge; Johnson, Judge; and Reilly, Judge.

**U N P U B L I S H E D   O P I N I O N**

JOHNSON, Judge

The district court terminated N.U.M.'s parental rights to her two-year-old son, A.P.M.-K., on the grounds that she neglected the duties of the parent-child relationship, that reasonable efforts by the county had failed to correct the conditions that led to the child's out-of-home placement, and that the child was neglected and in foster care. We

conclude that the district court did not err by admitting lay opinion testimony from a social worker and the guardian *ad litem*, that the district court did not err in its findings with respect to the first statutory basis for termination, and that the district court did not err by finding that termination of N.U.M.'s parental rights is in A.P.M.-K.'s best interests. Therefore, we affirm.

## FACTS

N.U.M. gave birth to A.P.M.-K. in December 2013. On March 22, 2014, N.U.M. voluntarily went to a hospital because she was having suicidal thoughts. Hospital staff placed her on a 72-hour hold because they believed that she was unable to cope with post-partum depression or to care for A.P.M.-K. The hospital contacted Hennepin County, which assumed custody of A.P.M.-K. N.U.M. was diagnosed with severe depression and anxiety but refused to engage with treatment offered by the hospital. She was discharged on March 24, 2014.

Hennepin County filed a CHIPS petition within a couple days. The county placed A.P.M.-K. in foster care on April 30, 2014. The district court held a hearing on the county's petition on June 5, 2014. N.U.M. admitted "that she has issues with mental health that are serious enough that if left untreated" and that "such mental health issues could prevent her from properly parenting her child," and she admitted that A.P.M.-K. is in need of protection or services. The district court withheld adjudication pending N.U.M.'s compliance with a case plan. On September 5, 2014, the district court dismissed the petition because N.U.M. had successfully completed the case plan. The county returned A.P.M.-K. to N.U.M.

Five days later, on September 10, 2014, N.U.M. went to a medical appointment for her knee. A nurse noticed that A.P.M.-K. looked ill and lethargic, that he had difficulty breathing, and that his skin was hot to the touch. N.U.M. told the nurse that she had been told the previous day to bring A.P.M.-K. to a hospital due to his three-day-long fever. An ambulance was called to transport A.P.M.-K. to a hospital. N.U.M. declined to ride with A.P.M.-K. in the ambulance because, she said, she had other things to do and needed to find something to eat. A.P.M.-K. was admitted to a hospital with a fever of 104.6 degrees. A nurse called N.U.M. to tell her that "her presence was needed and required immediately." When N.U.M. arrived at the hospital 15 to 20 minutes later, she became, in her own words, "hysterical" and had to be escorted out of the emergency room. A.P.M.-K. was diagnosed with pneumonia. When he was discharged, the county again assumed custody.

On September 17, 2014, Hennepin County filed a second CHIPS petition. In December 2014, N.U.M. was diagnosed with depression, post-traumatic stress disorder (PTSD), and attention-deficit hyperactivity disorder (ADHD). At a hearing on November 19, 2014, N.U.M. admitted that A.P.M.-K. was in need of protection or services. The district court ordered N.U.M. to comply with a case plan, which allowed her to have visits with A.P.M.-K. once or twice each week, for an hour and a half each time, at a supervised facility.

On December 8, 2014, N.U.M. voluntarily began an out-patient psychotherapy program at Hennepin County Medical Center for five weeks in the mornings and early afternoons. N.U.M. did so even though it was not required by her case plan. While she was in the out-patient program, N.U.M. cancelled all visits with A.P.M.-K., despite the

opportunity to schedule visits in the evening hours, because she thought it was too difficult for her to coordinate transportation.

On May 4, 2015, Hennepin County petitioned for the termination of N.U.M.'s parental rights to A.P.M.-K. The petition alleged four statutory bases: (1) failure to comply with the duties of the parent-child relationship, *see* Minn. Stat. § 260C.301, subd. 1(b)(2) (2014); (2) palpable unfitness, *see id.*, subd. 1(b)(4); (3) failure of reasonable efforts to correct conditions leading to placement, *see id.*, subd. 1(b)(5); and (4) the child is neglected and in foster care, *see id.*, subd. 1(b)(8).

In late July 2015, N.U.M. began overnight visits with A.P.M.-K. at her home. In mid-August, the visits were expanded from two days and one night per week to four days and three nights per week (from Saturday to Tuesday). On August 31, 2015, the third day of a four-day visit, N.U.M. called one of A.P.M.-K.'s foster parents and asked that A.P.M.-K. be picked up because, in the words of the child-protection social worker, she was "having a breakdown." On September 5, 2015, the first day of the next four-day visit, a foster parent called the social worker to report that when A.P.M.-K. was dropped off, N.U.M. said that she had no food in her home. That visit ended the next day, when N.U.M. called the foster parent and asked her to pick up A.P.M.-K. because he had a runny nose. Shortly thereafter, the county limited N.U.M.'s visits to one six-hour visit per week, on Saturday, without any overnight visits, because N.U.M. said that she could not care for A.P.M.-K. on weekdays due to being occupied with her part-time job, going to psychotherapy sessions, accessing other resources, and running errands.

The district court conducted a trial on four days in November and December of 2015. The county called three witnesses: N.U.M., a social worker in the Hennepin County Human Services and Public Health Department, and the guardian *ad litem*. The social worker testified that N.U.M.'s mental-health problems impair her ability to be a parent to A.P.M.-K. The social worker testified that N.U.M. is "impulsive, fixated, [and] hypervigilant." The social worker testified that N.U.M.'s ADHD "takes away from her ability to parent and ensure the needs of her child" and that her unmanaged PTSD leaves her vulnerable to future mental-health crises. The social worker testified that N.U.M.'s mental health has affected her ability to parent because "when somebody is not in front of her and she is on her own, [she] does not have an ability to follow through with . . . her case plan" or to focus on prioritizing A.P.M.-K.'s needs. Similarly, the guardian *ad litem* testified about her concerns that N.U.M.'s mental health impairs her ability to parent. She testified that N.U.M.'s mental instability disrupted her ability to care for A.P.M.-K. and that N.U.M. cannot prioritize A.P.M.-K.'s needs over her own. She also testified that "it is not evident to me that [N.U.M.] has gained the insight, the stability and the control of her mental-health issues that would make her a safe parent" and that N.U.M. does not have "the stability and the structure" that A.P.M.-K. requires.

N.U.M.'s witnesses included a program manager at a supportive-housing program and a case manager at a drop-in youth center. They testified about the services provided to N.U.M. through their programs. N.U.M. also testified on her own behalf. She testified that her mental health is stable and that her mental-health problems do not impact her ability to be a parent. N.U.M. testified that she was taking medication to treat her anxiety,

5

that she had stopped taking medication only when she lost insurance coverage in August 2014, but that she resumed taking medication after her insurance was reinstated and was doing so at the time of trial. N.U.M. also testified that "with all these services in place . . . there's nothing to worry about."

In January 2016, the district court issued a 33-page, single-spaced order in which it granted the petition to terminate N.U.M.'s parental rights to A.P.M.-K. The district court concluded that the county had established, by clear and convincing evidence, three of the four alleged statutory grounds for termination: that N.U.M. neglected to comply with the duties imposed by the parent-child relationship, *see* Minn. Stat. § 260C.301, subd. 1(b)(2); that reasonable efforts by the county had failed to correct the conditions that led to A.P.M.-K.'s out-of-home placement, *see id.*, subd. 1(b)(5); and that A.P.M.-K. is neglected and in foster care, *see id.*, subd. 1(b)(8). The district court also concluded that termination is in the best interests of A.P.M.-K. N.U.M. moved for a new trial or amended findings. The district court denied the motion. N.U.M. appeals.

### D E C I S I O N

### I. Testimony of Social Worker and Guardian *ad Litem*

N.U.M. argues that the district court erred by allowing the county to introduce testimony of the social worker and the guardian *ad litem* concerning her mental health and how it affected her parenting. She contends that the testimony consists of expert opinions but that the social worker and the guardian *ad litem* were not qualified as expert witnesses. In response, the county argues that the challenged testimony is admissible as lay opinion evidence. This court applies an abuse-of-discretion standard of review to a district court's

6

ruling on the admissibility of evidence in a termination-of-parental-rights case. *In re Welfare of Children of J.B.*, 698 N.W.2d 160, 172 (Minn. App. 2005).

During the county's case-in-chief, the county's attorney examined the social worker as to whether N.U.M. exhibits the symptoms of her mental-health diagnoses. N.U.M. objected on the ground that the social worker is not an expert in adult psychiatry or psychology. The district court sustained the objection. The county's attorney then asked the social worker, "How does [N.U.M.'s] mental health affect her on a day-to-day basis?" N.U.M. asserted the same objection. The district court overruled the objection. N.U.M. asserted a standing objection, which the district court recognized. The county's attorney later examined the guardian *ad litem* concerning whether N.U.M.'s mental health impairs her ability to parent. N.U.M. objected to the question on the ground that there had "been no foundation laid as to her expertise on mental health issues." The district court again overruled the objection. After trial, the district court denied N.U.M.'s motion for a new trial on the ground that the testimony of the social worker and the guardian *ad litem* was "rationally based upon their own perceptions and helpful to the determination of a fact in issue" and, therefore, admissible as lay opinion evidence. The district court's post-trial order also reasoned that the evidence is admissible pursuant to a statute governing CHIPS proceedings.

The statute referenced in the district court's post-trial order provides that a district court, before terminating parental rights, "may consider any report or recommendation made by the responsible social services agency [or] guardian ad litem," among other persons. Minn. Stat. § 260C.193, subd. 2 (2014). This statute does not say that such reports

or recommendations are admissible *per se*. *See In re Welfare of Child of D.L.D.*, 865 N.W.2d 315, 320-21 (Minn. App. 2015), *review denied* (Minn. July 21, 2015). Indeed, another statute in chapter 260C provides, "In all adjudicatory proceedings regarding juvenile protection matters under this chapter, the court shall admit only evidence that would be admissible in a civil trial." Minn. Stat. § 260C.163, subd. 1(a) (2014). The latter statute is consistent with a rule of court that states, "in a juvenile protection matter the court shall only admit evidence that would be admissible in a civil trial pursuant to the Minnesota Rules of Evidence." Minn. R. Juv. Prot. P. 3.02, subd. 1.

The rule of evidence that governs lay opinion evidence provides,

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Minn. R. Evid. 701.[1] This court has applied rule 701 in a TPR case in a manner that supports the district court's reasoning. In *In re Welfare of R.T.*, 364 N.W.2d 884 (Minn. App. 1985), we stated, "The opinions of a guardian ad litem or any lay witness are

---

[1]Rule 701 was amended earlier this year so that it now includes a third requirement, that the witness's testimony must be "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *Order Promulgating Amendments to the Minnesota Rules of Evidence*, No. ADM10-8047 (Minn. May 5, 2016). That amendment was not in effect at the time of trial in this case; the amended rule took effect July 1, 2016. *See id.* Nonetheless, the 2016 amendment highlights the distinction between expert opinions and lay opinions, a distinction that was recognized in the caselaw before 2016. *See, e.g.*, *Blatz v. Allina Health Sys.*, 622 N.W.2d 376, 388 (Minn. App. 2001) (stating that "whether expert testimony is required depends on the nature of the question to be decided by the trier of fact and on whether technical or specialized knowledge will assist the trier of fact"), *review denied* (Minn. May 16, 2001).

admissible if rationally based upon their own perceptions and helpful to the determination of a fact in issue." *Id.* at 887.

In this case, N.U.M. does not appear to directly challenge either the first or second requirement of rule 701. Her argument assumes that the testimony contains an expert opinion, in which case the testimony would be inadmissible because neither witness was qualified as an expert. *See* Minn. R. Evid. 702. N.U.M.'s premise is inconsistent with the district court's ruling, which expressly noted that the social worker and the guardian *ad litem* did *not* diagnose N.U.M. but, rather, relied on the diagnoses of medical professionals when forming their own opinions about N.U.M.'s parenting abilities. N.U.M.'s contention could be construed as challenging the first requirement of rule 701. But the evidentiary record makes clear that both the social worker and the guardian *ad litem* were personally familiar with N.U.M. and, thus, had the requisite foundation for their testimony.

Thus, the district court did not err by overruling N.U.M.'s objections to the lay opinion testimony of the social worker and the guardian *ad litem*.

## II. Grounds for Termination

N.U.M. argues that the evidence is insufficient to support the district court's findings that the county proved, by clear and convincing evidence, three statutory grounds for termination. If such an argument is made, this court "closely inquire[s] into the sufficiency of the evidence to determine whether it was clear and convincing." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). We will affirm a district court's termination of parental rights if "at least one statutory ground for termination is

supported by clear and convincing evidence and termination is in the child's best interests."

*In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn. 2004).

We begin by considering N.U.M.'s argument with respect to the district court's finding that N.U.M. neglected the duties of the parent-child relationship. *See* Minn. Stat. § 260C.301, subd. 1(b)(2). A district court may terminate a parent's parental rights to a child if it finds that the parent

> has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, including but not limited to providing the child with necessary food, clothing, shelter, education, and other care and control necessary for the child's physical, mental, or emotional health and development, if the parent is physically and financially able, and either reasonable efforts by the social services agency have failed to correct the conditions that formed the basis of the petition or reasonable efforts would be futile and therefore unreasonable.

*Id.* To grant a petition for termination, the district court must find that, at the time of termination, the parent is not "presently able and willing to assume [her] responsibilities" and that the parent's neglect of these duties "will continue for a prolonged, indeterminate period." *In re Welfare of J.K.*, 374 N.W.2d 463, 466–67 (Minn. App. 1985) (quotation omitted), *review denied* (Minn. Nov. 25, 1985).

The district court found that N.U.M. failed to "make meaningful or significant progress" concerning her mental-health problems, which have had "continued negative impact on her ability to provide safe and appropriate care for [A.P.M.-K.]." The district court also noted that N.U.M. "has demonstrated an inability to provide for [A.P.M.-K.'s] physical, mental, and emotional needs for any extended period of time." The evidentiary

10

record supports these findings. N.U.M. neglected her parental duties to A.P.M.-K. when she failed to promptly seek treatment for A.P.M.-K.'s fever and, furthermore, when she declined to accompany him to a hospital. She neglected her parental duties to A.P.M.-K. when she did not visit him for five weeks while she was in out-patient treatment. She neglected her parental duties to A.P.M.-K. when she twice asked a foster parent to pick him up after only one or two days of independent parenting. These incidents are sufficient to establish neglect of parental duties under section 260C.301, subdivision 1(b)(2). *See In re Welfare of Children of K.S.F.*, 823 N.W.2d 656, 663-68 (Minn. App. 2012) (affirming termination of parental rights of mother who, despite education, instruction and other services, could not adequately parent her children); *In re Welfare of B.L.W.*, 395 N.W.2d 426, 427-31 (Minn. App. 1986) (affirming termination of parental rights of mother who failed to understand child's needs and to demonstrate desire to permanently parent).

N.U.M. contends that the evidence is insufficient on the grounds that section 260C.301, subdivision 1(b)(2), requires evidence of "actual, harmful neglect" and that there is no such evidence in this case. The language of the statute does not require actual harm arising from a parent's refusal or neglect of parental duties. Because N.U.M.'s contention is inconsistent with the plain language of the statute, the county is not required to prove that A.P.M.-K. suffered harm. *See In re Welfare of Child of L.M.L.*, 730 N.W.2d 316, 321 (Minn. App. 2007) (stating in parenthetical that "courts cannot add language that is not present in statute or supply what legislature purposely omits or inadvertently overlooks") (citation omitted).

N.U.M. also contends that the district court erred by failing to account for the fact that she is a single parent and by faulting her for seeking help from a support network. The district court acknowledged that N.U.M. had located many services and had built a support network. But the district court expressly found that her support network was not an "adequate safety net" because it was in place at the times when A.P.M.-K. had to be removed from her care. The district court's concern was appropriately focused not on N.U.M.'s reliance on her support network but on whether she can fulfill her parental duties to A.P.M.-K. with a support network in place. We note that the record shows that N.U.M. and A.P.M.-K. will no longer be eligible for some of the services they are receiving after the passage of time, which further establishes the need for N.U.M. to be able to fulfill her parental duties toward A.P.M.-K. with a substantial degree of independence.

Thus, the district court's finding that N.U.M. neglected the duties of a parent-child relationship is supported by clear and convincing evidence. Because the first ground relied on by the district court is proper, we need not consider whether the evidence is sufficient to support the district court's findings on the second and third grounds. *See R.W.*, 678 N.W.2d at 55.

### III. Best Interests of the Child

N.U.M. argues that the district court erred by finding that termination is in A.P.M.-K.'s best interests.

In any termination-of-parental-rights case, the best interests of the child "must be the paramount consideration." Minn. Stat. § 260C.301, subd. 7 (2014). When resolving such a case, a district court must make "findings regarding how the order is in the best

interests of the child." Minn. R. Juv. Prot. P. 42.08, subd. 1(b). Termination of parental rights is inappropriate if termination is not in a child's best interests, even if one or more of the statutory bases for termination have been proved. *In re Welfare of Child of D.L.D.*, 771 N.W.2d 538, 545 (Minn. App. 2009). "In analyzing the best interests of the child, the court must balance three factors: (1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child." *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992). "Competing interests include such things as a stable environment, health considerations and the child's preferences." *Id.* "Where the interests of parent and child conflict, the interests of the child are paramount." Minn. Stat. § 260C.301, subd. 7. This court applies an abuse-of-discretion standard of review to a district court's finding that termination is in a child's best interests. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 905 (Minn. App. 2011), *review denied* (Minn. Jan. 17, 2012); *In re Welfare of Children of D.F.*, 752 N.W.2d 88, 95 (Minn. App. 2008).

The district court found that A.P.M.-K.'s best interests require an adult "who is consistently available and reliable to provide for his day to day needs." The district court found that N.U.M. is not such a person because of her "ongoing inability to manage her mental health and be an appropriate, safe, and available parent." The district court found that it is clear that N.U.M. loves A.P.M.-K. and wants to parent him. But the district court stated that it "cannot envision, within the foreseeable future, [N.U.M.] improving or the situation changing [such] that she [could] successfully parent him."

13

N.U.M.'s main contention is that the district court failed to account for her status as a single parent with no family support. N.U.M. contends that the district court improperly based termination on "discomfort about Appellant getting stressed out . . . with absolutely no ability to say how this ever put the child at risk." The evidence in the record supports the district court's findings and conclusion regarding the best-interests requirement. The social worker testified that termination of N.U.M.'s parental rights was proper because A.P.M.-K. needs to be in a place where she could have "no doubt that every basic need that he has is being met." The guardian *ad litem* testified that termination would be in A.P.M.-K.'s best interests because N.U.M. does not have the "ability to safely and appropriately care for him and meet all of his needs and prioritize his needs over hers."

Thus, the district court did not err by finding that termination of N.U.M.'s parental rights is in A.P.M.-K.'s best interests.

**Affirmed.**